REVISED

T.C. Memo. 2021-14

UNITED STATES TAX COURT

COMPLEX MEDIA, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 13368-15, 19898-17.[1]          Filed March 31, 2021.

P, a corporation, acquired the assets of a business previously conducted by partnership PS. In exchange for the transferred assets, P issued 4,999,000 shares of its common stock. Immediately thereafter, in accordance with a prior obligation, P redeemed 1,875,000 of the common shares held by PS in exchange for $2.7 million in cash and P's obligation to make an additional payment of $300,000 a little over a year later. PS paid the cash and assigned its right to the additional payment to SG, one of its partners, in redemption of SG's interest in PS. P claimed an increased basis of $3 million in intangible assets it acquired from PS and amortized that additional basis under I.R.C. sec. 197(a). R disallowed P's claimed amortization deductions.

_____

[1]We consolidated the cases at docket Nos. 13368-15 and 19898-17 for trial, briefing, and opinion.

**Served 03/31/21**

**[\*2]**     Held:  A taxpayer's ability to identify an alternative path to a given end result that provides more favorable tax consequences than the path actually taken is not enough to entitle the taxpayer to the desired tax treatment.  Commissioner v. Nat'l Alfalfa Dehydrating & Milling Co., 417 U.S. 134 (1974).

Held, further, because any tax planning involved in structuring the transactions in issue was focused on insulating PS' continuing partners from the consequences of the redemption of SG's interest and not on the achievement of a tax benefit inconsistent with allowing P increased bases in the assets it acquired from PS, P is not precluded from seeking to disavow the form of its transactions.

Held, further, P's issuance and immediate redemption of 1,875,000 common shares had no economic substance and thus are disregarded under the step transaction doctrine, with the cash and deferred payment right treated as additional consideration for the assets P acquired from PS.

Held, further, accepting the parties' agreement that I.R.C. sec. 351 applied to PS' transfer of assets to P, PS recognized gain in the transaction, as recharacterized, to the extent of the $2.7 million cash it received and the fair market value of its right to the additional $300,000 payment.  See I.R.C. sec. 351(b).  PS' recognized gain increases P's bases in the transferred assets.  See I.R.C. sec. 362(a).

Held, further, when assets transferred in an I.R.C. sec. 351 exchange with taxable "boot" constitute a trade or business, the residual method of allocation prescribed by I.R.C. sec. 1060 can appropriately be used to allocate the boot among the transferred assets.  Consequently, PS' gain in amortizable section 197 intangibles, and the corresponding increase in asset bases allowed to P, is determined by subtracting from the agreed total asset value the estimated values of those assets other than amortizable section 197 intangibles.

[*3]   Richard J. Sapinski and Robert A. Stern, for petitioner.

Lisa M. Rodriguez, Shawna A. Early, and Lyle B. Press, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


HALPERN, Judge:  In a notice issued in February 2015, respondent advised Complex Media, Inc. (petitioner or CMI), that he had determined deficiencies in its Federal income tax for calendar years 2010, 2011, and 2012.  The deficiency for each of 2010 and 2012 was $69,635; the deficiency for 2011 was $1 less.  By a separate notice, issued in June 2017, respondent advised petitioner that he had determined a deficiency of $77,730 in its Federal income tax for calendar year 2013.  The deficiencies arose from respondent's disallowance of petitioner's deduction, for each of the years in issue, of $204,808 of amortization in respect of intangible assets it acquired from a partnership, Complex Media Holdings, LLC (CMH).  Respondent now concedes that $4,808 of the deduction claimed for each year is allowable, leaving $200,000 of amortization in issue for each year.  In determining whether petitioner is entitled to deduct more than the $4,808 of amortization that respondent would allow for each year in respect of the assets petitioner acquired from CMH, we must decide:  (1) whether the tax consequences

[*4] to petitioner of its acquisition of the assets of CMH's magazine and internet media business (transferred business) must be determined in accordance with the form of that transaction, as delineated in a Contribution, Merger, and Joint Venture Agreement (CM & JV Agreement) that required petitioner to issue 4,999,000 shares of its common stock in exchange for those assets; (2) if not, whether, by application of the step transaction doctrine, the transaction should be recharacterized to include in the consideration that petitioner paid for the assets the $2.7 million in cash and the right to an additional future payment of $300,000 that petitioner distributed to CMH in immediate redemption of 1,875,000 of those 4,999,000 shares; and (3) if the transaction should be so recharacterized, the portion of the resulting gain recognized by CMH in the exchange that is allocable to amortizable section 197 intangibles, entitling petitioner to increase its tax bases in those assets and allowing it annual amortization deductions beyond those attributable to the bases of those assets in CMH's hands.

All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated. We round all dollar amounts to the nearest dollar.

[*5]                           FINDINGS OF FACT

Petitioner was organized or incorporated in May 2009 to participate in the transactions described below.  When petitioner filed its petitions in the present cases, it maintained its principal place of business in New York, New York.

Background

The periodical that served as the foundation of the transferred business began publication, in print form, in May 2002.  Richard Antoniello was hired to run the magazine and later acquired an equity interest in the business.  At the end of 2006, Mr. Antoniello began developing the online portion of the business.  CMH was organized in January 2008 to serve as a holding company for two limited liability companies that, between them, had previously conducted the transferred business.

The transactions at issue resulted from a search for financing to fund further development of the business.  Eventually, CMH identified OnNetworks, Inc. (OnNetworks or ONI), as a potential investor.  OnNetworks had raised about $19 million through the issuance of common and preferred stock but had lost most of its initial funding in pursuit of an unsuccessful business venture.  By early 2009, OnNetworks had about $6.3 million in cash left--less than the amount its preferred

**[*6]** shareholders were entitled to receive upon a liquidation of the corporation (liquidation preference).

During negotiations over a business combination involving CMH and OnNetworks, friction developed between OnNetworks preferred shareholders and Seth Gerszberg, one of CMH's partners. The other partners urged Mr. Gerszberg to withdraw from the business to allow the intended transaction to go forward, but they lacked the funds to buy out his interest. Negotiations ultimately coalesced around a plan under which a portion of OnNetworks' remaining cash would be used to redeem Mr. Gerszberg's interest in CMH and the remainder used as operating capital for the transferred business.

The Transactions in Issue

The transactions in issue were implemented by several agreements, all dated on or as of November 25, 2009, including the CM & JV Agreement among petitioner, CMH, OnNetworks, and an acquisition subsidiary of petitioner; an Asset Purchase Agreement between CMH and its two subsidiaries; a Stock Repurchase Agreement between petitioner and CMH; and a Unit Purchase Agreement between CMH and Mr. Gerszberg.

**[*7]**   CMH's Acquisition of the Transferred Business

Under the Asset Purchase Agreement, CMH acquired from its two subsidiaries direct ownership of the assets of the transferred business, which that agreement refers to as the "Acquired Assets".  The term "Acquired Assets" means

> all of the Sellers' right, title and interest * * * in and to all of the assets, properties and rights owned by the Sellers if used or developed, created or held for use in the operation by the Sellers of their Complex Media business unit, the www.complex.com domain name and content, and the Complex magazine business and content (collectively, the "Business"), but excluding the Excluded Assets.[2]

The agreement provides a nonexclusive list of assets and properties included in Acquired Assets, including all "Intellectual Property" (broadly defined) "used in or useful to the Business".[3]  The list of Acquired Assets also includes "any and all

---

[2]The term "Excluded Assets" refers to cash, receivables and specified contracts.

[3]The term "Intellectual Property" is defined to mean

(i) all inventions (whether patentable or unpatentable and whether or not reduced to practice) and all improvements thereto; (ii) all design rights, trademarks, service marks, (whether or not registered) trademark licenses, trade dress, and logos, trade names, URLs and Internet domain names, together with all translations, adaptations, derivations, and combinations thereof and including all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith; (iii) all copyrightable works and all copyrights (whether or not registered), and all applications, registrations, and renewals in connection therewith; (iv) mask works,

(continued...)

**[*8]** permits, certificates, licenses, franchises and authorizations obtained from any federal, state, municipal or local government", "any and all books, records and other information, data and documentation of the Business or otherwise if directly related to any of the Acquired Assets", and "all equipment, furnishings, inventories of goods and office supplies, paper, pre-paid postage and materials related to the Complex magazine including, without limitation, those items set forth on <u>Schedule 1.1(b)</u> attached hereto".  Schedule 1.1(b) to the Asset Purchase Agreement includes an eight-page list of what appears to be computer equipment.

---

[3](...continued)
(v) all computer software and licenses, and all source code, data, files and documentation related thereto; (vi) all trade secrets and confidential, technical and business information (including, without limitation, ideas, products under development, products contemplated for development, research and development, statistical models, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals); (vii) all rights provided by bilateral and international treaties or conventions; (viii) all copies and tangible embodiments thereof (in whatever form or medium, including, without limitation, all copies stored on computers); (ix) other tangible or intangible proprietary information or materials used by any of the Sellers (together with all licenses, authorizations, pending applications, continuations-in-part and extensions for any of the above); and (x) all rights to sue or recover and retain damages and costs and attorneys' fees for past, present and future infringement or misappropriation of any of the foregoing[.]

[*9] It also lists several items of office furniture (chairs, file and storage cabinets, tables, a bookshelf and couch, trash cans) and equipment (mail sorter, "refridgerator [sic]", and microwave oven).

### Petitioner's Acquisition of the Assets of the Transferred Business and the OnNetworks Stock

The CM & JV Agreement provided for the simultaneous occurrence of two events: (1) the merger of petitioner's acquisition subsidiary into OnNetworks, and (2) CMH's contribution to petitioner of the assets of the transferred business. The CM & JV Agreement defines the assets to be contributed as those acquired by CMH pursuant to the Asset Purchase Agreement. In exchange for those assets, CMH was entitled to receive 4,999,000 shares of petitioner's common stock.

The merger of petitioner's acquisition subsidiary into OnNetworks was approved by a shareholder consent executed by one of OnNetworks' common shareholders and six of its preferred shareholders, who together held stock with 67.5% of the voting rights of all of the OnNetworks stock. In the merger, the former holders of preferred stock in the surviving corporation exchanged that stock for 2,731,808 preferred shares in petitioner.[4] Petitioner received its common

---

[4]Under the CM & JV Agreement, the maximum merger consideration to which the OnNetworks preferred shareholders would have been entitled was 3 million shares of petitioner's preferred stock. Because OnNetworks' cash on

(continued...)

[*10] stock in OnNetworks by conversion in the merger of its common stock in its acquisition subsidiary. OnNetworks' previously outstanding common stock was canceled in the merger for no consideration.[5]

The CM & JV Agreement expresses the intent of the parties to that agreement that the merger of petitioner's acquisition subsidiary into OnNetworks "qualify as a reorganization within the meaning of Section 368(a) of the Code". By contrast, the description of the expected Federal income tax consequences of the merger included in the Information Statement prepared in connection with the transaction states: "In general, the Merger will be treated as a non-taxable transaction to the stockholders under Section 351 of the Code". The statement makes no mention of section 354, the nonrecognition rule that would apply to the

---

[4](...continued)

hand at closing proved to be less than an agreed threshold amount, its preferred shareholders agreed to reduce the number of preferred shares to which they were entitled by 268,192 (3,000,000 − 268,192 = 2,731,808).

[5]For the purpose of allocating merger consideration among OnNetworks shareholders, the merger was treated as a liquidation under the terms of OnNetworks' certificate of incorporation because the aggregate merger consideration did not constitute a majority voting interest in petitioner. Because the value of the merger consideration was less than the liquidation preference to which OnNetworks preferred shareholders were entitled, they received all of that consideration.

[*11] exchange of OnNetworks preferred stock for petitioner's common stock if that exchange were "in pursuance of * * * [a] plan of reorganization".

### Redemption of Common Stock of Petitioner

The Stock Repurchase Agreement provided for CMH's sale of 1,875,000 of petitioner's common shares back to petitioner in exchange for $3 million in cash, with $2.7 million to be paid at closing on November 25, 2009, and an additional payment of $300,000 to be made on January 3, 2011. The CM & JV agreement required petitioner to "use commercially reasonable efforts to give effect to * * * [its] repurchase of 1,875,000 shares of * * * Common Stock pursuant to the [Stock] Repurchase Agreement promptly following the Effective Time."[6]

### Initial Stock Certificate Issued by Petitioner to CMH

On November 25, 2009, petitioner issued a certificate to CMH representing 3,125,000 shares of petitioner's common stock. The number of shares represented by that certificate equals the 1,000 shares that the CM & JV Agreement described as issued and outstanding before that agreement (a certificate for which apparently had not yet been issued), plus the 4,999,000 shares petitioner was required by the

---

[6]The term "Effective Time", as used in the CM & JV Agreement, refers to the time at which "[t]he consummation of the transactions contemplated by th[at] Agreement" took place.

[*12] CM & JV Agreement to issue in exchange for the transferred assets, less the 1,875,000 shares redeemed under the Stock Repurchase Agreement.

### Redemption of Mr. Gerszberg's Interest in CMH

Under the Unit Purchase Agreement, Mr. Gerszberg sold his interest in CMH back to the partnership in exchange for the consideration CMH was entitled to receive in redemption of 1,875,000 shares of petitioner's common stock--that is, an immediate payment of $2.7 million in cash and the partnership's assignment to Mr. Gerszberg of its right to the additional future cash payment. Shortly before the closing of the transactions in issue, CMH's partners amended section 10.3(a) of the partnership's Operating Agreement (captioned "Other Allocation Rules") to add the proviso that, "to the extent that taxable income or gain is recognized by the Company by reason of the Company's receipt of money or other property that is used to fund the redemption of a particular Member's Units in the Company, the Company shall allocate such taxable income or gain to such redeemed member."

CMH's operating agreement gave its managers broad discretion over the timing and amount of distributions by the partnership. But the managers were required to make distributions, to the extent of available cash, to allow members to pay tax on their shares of the partnership's income (referred to as the Tax Distribution Amount). Paragraph 4.6(a) of the Unit Purchase Agreement provides:

**[*13]** In addition to the Closing Payment, the Company shall distribute, if applicable, to the Seller [Mr. Gerszberg] the Tax Distribution Amount as contemplated by Section 4.4 of the Operating Agreement as in effect on the date hereof at the time specified therein, provided however, that any taxable income attributable to so-called "boot" under Section 351 of the Code recognized by the Company by reason of the Company's contribution of certain assets and liabilities of the Company to CMI in exchange for CMI shares that is allocated to Seller pursuant to the Operating Agreement shall be disregarded for purposes of calculating the Tax Distribution Amount.

Voting Rights of Petitioner's Shareholders

Petitioner's certificate of incorporation, as amended on the date of closing of the transactions in issue, provided that each of petitioner's common shares was entitled to one vote. Petitioner's preferred stock was convertible into its common stock, and the preferred stock carried voting rights equal to those of the common stock into which it was convertible. Under the initial conversion ratio, the 2,731,808 shares of preferred stock in petitioner issued to the former OnNetworks shareholders could be converted into 3,122,843 common shares of petitioner.[7]

---

[7]Petitioner's Amended and Restated Certificate of Incorporation, filed on November 25, 2009, provides that each share of its preferred stock can be converted into a number of shares of petitioner's common stock determined by dividing (1) the Original Issue Price plus accrued but unpaid preferred dividends by (2) the Conversion Price. The Original Issue Price was $1.6667 per share, and the initial Conversion Price was $1.4580. Therefore, immediately after issuance, petitioner's 2,731,808 preferred shares could be converted into 3,122,843 shares of its common stock (2,731,808 × ($1.6667 ÷ $1.4580)).

**[\*14]** <u>Tax Reporting</u>

>  <u>CMH and Petitioner</u>

>  > <u>Redemption Proceeds</u>

The Form 1065, U.S. Return of Partnership Income, that CMH filed for its taxable year ended December 31, 2009, does not reflect its receipt from petitioner of $2.7 million in cash and the right to an additional payment of $300,000 on January 3, 2011. The only income items shown on the partnership's return other than gross profit from the sale of goods are a bad debt recovery of $58,703 and interest income of $20,465.

>  > <u>Amortization of Section 197 Intangibles</u>

CMH's 2009 return reported amortization expense of $4,808. That amortization related to eight trademarks with an aggregate original cost of $22,142 and unamortized basis of $12,889 and a domain name with an original cost of $50,000 and an unamortized basis of $25,836.

The amortization petitioner reported in its return for each of the years in issue includes $4,808 of amortization attributable to carryover bases of those same assets. Petitioner's returns claimed an additional $200,000 in respect of an "intangible asset" acquired on November 25, 2009, with an unadjusted cost or basis of $3 million (equal to the sum of the $2.7 million immediate cash payment

[*15] and the $300,000 deferred payment petitioner was required to make in the redemption of 1,875,000 of the shares issuable in exchange for the assets of the transferred business).

### Depreciation or Amortization of Fixed Assets and Software

Petitioner's 2010 Form 1120, U.S. Corporation Income Tax Return, includes a Depreciation and Amortization Report that lists 17 items--variously labeled furniture and fixtures, machinery and equipment, computer equipment, computer software, and a leasehold improvement--that also appear on a similar report included in CMH's 2009 return. The reports describe those items as having been acquired between January 2001 and July 2008. According to the reports, the items other than computer software had an aggregate original cost of $132,993. The computer software had an aggregate original cost of $26,036. The reports also show that all but 2 of the 17 commonly reported items had been fully depreciated or amortized. The costs of the items other than computer software and the leasehold improvement had been, or were being, recovered over periods ranging from five to seven years. The only items whose costs had not been fully recovered were the leasehold improvement and one item of furniture and fixtures, which had remaining bases to CMH of $641 and $162, respectively.

[*16] The depreciation and amortization schedule included with CMH's 2009 return reports the three items of computer software as having been acquired between January 2001 and March 2002. Each item had been assigned a three-year life.

### Section 351 Disclosures

In disclosures provided under section 1.351-3, Income Tax Regs., petitioner's and CMH's 2009 returns reported the transferred assets as having a fair market value of $8 million and an aggregate basis of $237,702. A report included in workpapers of petitioner's accountants describes the basis figure as the sum of $224,119 of prepaid expenses and $13,583, which is identified as the "Contributed BV [apparently book value] of PP&E and TM".[8]

### Other

Petitioner's 2010 return reports retained earnings at the beginning of the year of about $80,000. Petitioner's accountant, Daniel Hickey, signed that return as paid preparer and also signed petitioner's returns for 2011 and 2013 and CMH's

---

[8]The amount stated in the accountants' workpapers as the book value of the trademarks and property, plant, and equipment is $109 less than the aggregate basis of those items reported on CMH's 2009 tax return ($12,889 + $803 = $13,692; $13,692 – $13,583 = $109). That return provides no indication that the book value of the assets differed from their tax bases. In particular, Schedule M-1, Reconciliation of Income (Loss) per Books With Income (Loss) per Return, of that return reports no adjustments.

[*17] 2009 return in the same capacity. (The copy of petitioner's return for 2012 included in the record has Mr. Hickey's name printed as paid preparer, but his signature does not appear on that copy.)

Mr. Gerszberg

The Form 1040, U.S. Individual Income Tax Return, that Mr. Gerszberg filed for calendar year 2009 (also prepared by Mr. Hickey) reports long-term capital gain of $4,262,162 from the redemption of his interest in CMH. The reported gain is the difference between a stated sale price of $2.7 million and a "cost or other basis" of –$1,562,142.[9] Mr. Gerszberg's 2011 return reports "Other income" of $300,000 received from petitioner.

Explanations in Notices of Deficiency of Disallowance of Claimed Amortization Deductions

Respondent's notice of deficiency for 2010 through 2012 explained as follows his disallowance of $204,808 of claimed amortization deductions: "[T]he amount of $204,808 claimed on your returns * * * as a deduction for amortization expense is not allowable because you have not established that this amount was incurred or, if incurred, paid by you during the taxable years for ordinary and

---

[9]At trial, Mr. Hickey attempted to explain the anomaly of negative basis as having been attributable to Mr. Gerszberg's receipt of a distribution of partnership assets after the basis of his partnership interest had been reduced to zero by his share of partnership losses.

[*18] necessary business purposes and that this amount qualifies as an allowable deduction under the provisions of the Internal Revenue Code."  By contrast, respondent's notice of deficiency for petitioner's 2013 taxable year focuses on petitioner's failure to have established entitlement to a $3 million stepped-up basis in amortizable section 197 intangibles it acquired from CMH.  That notice explains that respondent's disallowance of $204,808 of the amortization deduction petitioner claimed for 2013 was attributable to petitioner's failure to "establish that there was a step-up in basis in the intellectual property transferred to * * * [it] from Complex Media Holdings LLC."  The 2013 notice went on to state: "Accordingly, there is no amortization allowed as provided by section 197 of the Internal Revenue Code for the stated transaction."

OPINION

I.    Introduction

A.    Applicable Law

Section 197(a) allows taxpayers amortization deductions in respect of intangible assets that qualify as "amortizable section 197 intangible[s]".  A taxpayer can recover its adjusted basis in an amortizable section 197 intangible over 15 years beginning with the month of acquisition.  Sec. 197(a).  Section 197(d) identifies a broad range of assets as "section 197 intangible[s]", including

[*19] goodwill, going-concern value, workforce-in-place, business books and records, patents, copyrights, know-how, governmental licenses and permits, customer and supplier relationships, covenants not to compete, franchises, trademarks, and trade names. To qualify as "amortizable section 197 intangibles", most section 197 intangibles have to meet three conditions. First, the taxpayer must have acquired the asset after August 10, 1993 (section 197's date of enactment). Sec. 197(c)(1)(A). Second, the taxpayer has to hold the asset in connection with the conduct of a trade or business or other income-producing activity. Sec. 197(c)(1)(B). And third, subject to enumerated exceptions, the asset cannot have been created by the taxpayer. Sec. 197(c)(2). The exclusion for self-created intangibles does not apply to governmental licenses or permits, covenants not to compete, franchises, trademarks, or trade names. Id.

Section 351 generally provides nonrecognition treatment to incorporations and other transactions in which the controlling shareholders of a corporation transfer property to it in exchange for its stock. In particular, section 351(a) provides as a general rule: "No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock in such corporation and immediately after the exchange such person or persons are in control * * * of the corporation." Section 368(c) defines "control", for purposes of

[*20] section 351 and other specified sections, to mean "the ownership of stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote and at least 80 percent of the total number of shares of all other classes of stock of the corporation." If a shareholder receives nonstock consideration in an exchange that would otherwise qualify for nonrecognition treatment under section 351(a), the shareholder cannot recognize any loss but has to recognize any realized gain in an amount not in excess of the sum of the money and the fair market value of any other nonstock property (collectively, boot) the shareholder receives. Sec. 351(b). The transferee corporation's basis in property received in a section 351 exchange is "the same as it would be in the hands of the transferor, increased in the amount of gain recognized to the transferor on such transfer." Sec. 362(a).

If a section 351 exchange includes a section 197 intangible, the transferee corporation is treated as the transferor shareholder "with respect to so much of the adjusted basis in the hands of the * * * [corporation] as does not exceed the adjusted basis in the hands of the transferor." Sec. 197(f)(2)(A). The corporation, in effect, steps into the transferor's shoes and can "continue to amortize its adjusted basis, to the extent it does not exceed the transferor's adjusted basis, ratably over the remainder of the transferor's 15-year amortization period." Sec.

**[\*21]** 1.197-2(g)(2)(ii)(B), Income Tax Regs. Any increase in the basis of the section 197 intangible allowed by section 362(a) as a result of gain recognized by the shareholder is treated as though the corporation acquired the asset other than in a section 351 exchange (i.e., by purchase). Sec. 1.197-2(g)(2)(ii)(B), Income Tax Regs.

B.  Sorting Out the Issues

Identifying the issues that remain for decision has proved to be a challenge, leading to our request that the parties address in supplemental briefs a series of questions posed in an order dated April 24, 2020. Our efforts were not entirely successful.

The parties do seem to agree that petitioner acquired the assets of the transferred business in a section 351 exchange. If section 351 did not apply to the transaction, it would be treated as a taxable purchase and sale, and petitioner's bases in any amortizable intangibles would be higher than those it claims.[10] Sec.

---

[10]If petitioner acquired the assets of the transferred business in a taxable purchase and exchange, its basis in the amortizable section 197 intangibles included in the exchange would equal the fair market value of those assets, which, as explained infra part IV.D.6., we have determined to be $7,616,852. The "step-up" in the basis of those assets resulting from the transaction would be $7,578,127 ($7,616,852 value – $38,725 basis to CMH ($12,889 basis in trademarks + $25,836 basis in domain name))--an amount far in excess of the $3 million basis step-up petitioner claimed on its returns.

[*22] 1001(c) (requiring the recognition of "the entire amount of the gain or loss * * * on the sale or exchange of property" in the absence of an applicable nonrecognition rule), sec. 1012(a) (providing as a general rule that "[t]he basis of property shall be * * * [its] cost"). Petitioner, however, makes no claim that section 351 did not apply to its acquisition of the transferred business. In its opening brief, petitioner argues at some length for the application of section 351, even though it leaves a potentially critical issue unaddressed. As far as we can tell, respondent relies entirely on section 351 in support of his position that petitioner's bases in the assets it acquired from CMH were limited by section 362(a) to their bases in CMH's hands. Even so, respondent does not explain in any detail why section 351 applies to petitioner's acquisition of the transferred business, advising us only that he "did not dispute" (and, we presume, still does not dispute) petitioner's position that the "CM & JVA transaction occurred in conjunction with a tax-free exchange under section 351(a) of the Internal Revenue Code."

Applying to the transaction at issue the requirements for nonrecognition treatment under section 351, it is clear that CMH transferred property to petitioner in exchange for common stock of petitioner. But CMH was not, by itself, "in control" of petitioner "immediately after the exchange." The 5 million common

**[*23]** shares in petitioner that CMH would have held without regard to the immediate redemption of 1,875,000 of those shares would have provided CMH with only about 61.6% of the aggregate voting power of all of petitioner's outstanding voting stock (5,000,000 ÷ (5,000,000 + 3,122,843 common shares into which petitioner's preferred stock was convertible)).

Moreover, in applying the "control-immediately-after" requirement of section 351(a), our caselaw requires us to take the effects of the redemption into account--even if, as respondent would have us do, we were to treat the redemption as separate from the asset transfer. As we explained in Intermountain Lumber Co. & Subs. v. Commissioner, 65 T.C. 1025, 1031-1032 (1976):

> A determination of "ownership," as that term is used in section 368(c) and for purposes of control under section 351, depends upon the obligations and freedom of action of the transferee with respect to the stock when he acquired it from the corporation. Such traditional ownership attributes as legal title, voting rights, and possession of stock certificates are not conclusive. If the transferee, as part of the transaction by which the shares were acquired, has irrevocably foregone or relinquished at that time the legal right to determine whether to keep the shares, ownership in such shares is lacking for purposes of section 351. By contrast, if there are no restrictions upon freedom of action at the time he acquired the shares, it is immaterial how soon thereafter the transferee elects to dispose of his stock or whether such disposition is in accord with a preconceived plan not amounting to a binding obligation. * * *

**[*24]** In the present cases, the agreement that entitled CMH to receive 4,999,000 shares of petitioner's common stock in exchange for the assets of the transferred business contemplated the immediate redemption of 1,875,000 of those shares pursuant to another, simultaneously executed agreement.  CMH was not free to determine whether to keep those 1,875,000 shares.  Therefore, under Intermountain Lumber's "freedom of action" principle, we must take the redemption into account in determining whether CMH was in control of petitioner immediately after the exchange.  And by our calculations, the redemption reduced CMH's share of the aggregate voting power of petitioner's outstanding voting stock from about 61.6% to just over 50% $(3,125,000 \div (3,125,000 + 3,122,843) = 50.02\%)$.

Petitioner's position that the control-immediately-after test was met rests on the proposition that the OnNetworks preferred shareholders were transferors in the transaction along with CMH.  Petitioner argues that the transactions implemented under the CM & JV Agreement should be treated, "[f]or income tax purposes," as "a simultaneous (i) contribution of certain operating assets by CMH to Petitioner in exchange for common stock in Petitioner and (ii) contribution of the outstanding stock of ONI by the preferred stockholders of ONI to Petitioner in exchange for all of the preferred stock of Petitioner."  On the basis of that

[*25] characterization of the transaction, petitioner concludes that "the two transferors, being CMH and the preferred stockholders of ONI, owned 100% of the outstanding stock of Petitioner."

Contrary to petitioner's characterization of the transaction, OnNetworks preferred shareholders did not actually contribute any property to petitioner.[11] Their stock in OnNetworks was converted into preferred stock of petitioner in the merger of petitioner's acquisition subsidiary into OnNetworks. Petitioner received its common stock in OnNetworks not from OnNetworks preferred shareholders but instead by conversion in the merger of its common stock in its acquisition subsidiary. Thus, the stock the OnNetworks preferred shareholders surrendered in the merger was not the same type of stock that petitioner received in the merger.

In implicit recognition that it did not actually receive property from the OnNetworks preferred shareholders, petitioner cites Rev. Rul. 67-448, 1967-2 C.B. 144, for the proposition that, "[w]here a parent corporation forms a transitory merger subsidiary which merges into a target corporation, with the target corporation surviving, and the parent corporation then issues its stock to the

---

[11]Moreover, OnNetworks preferred shareholders could not have contributed to petitioner "the outstanding stock" of OnNetworks because they did not own all of that stock. Other shareholders owned common stock in OnNetworks until that stock was canceled in the merger.

**[*26]** former shareholders of the target corporation, the transaction is treated as an acquisition by the parent corporation of the stock of the target." Rev. Rul. 67-448, supra, involved what we would now call a "reverse triangular merger" that was carried out before Congress enacted special rules for those transactions in section 368(a)(2)(E). The ruling involved an acquiring corporation, P, that sought to acquire the business of a public utility, Y. Because of Y's status as a regulated entity, its corporate existence had to be maintained--that is, P had to acquire Y's stock rather than its assets. But not all of the Y shareholders were willing to surrender their Y stock to P. So P transferred shares of its voting stock to an acquisition subsidiary, S, in exchange for S stock. S then merged into Y. In the merger, P's stock in S was converted into Y stock. The Y stock held by nondissenting shareholders was converted into the P voting stock that S had received from P. Those Y shareholders who dissented from the transaction, who held less than 5% of Y's stock, received cash in exchange for their stock.

When the Internal Revenue Service (Service) issued Rev. Rul. 67-448, supra, the transaction described in the ruling could not have qualified as a tax-free reorganization under section 368(a)(1)(A) (that is, as a "statutory merger or consolidation") because the former Y shareholders retained their interests in Y's business only indirectly, through P. See Helvering v. Bashford, 302 U.S. 454

**[*27]** (1938); <u>Groman v. Commissioner</u>, 302 U.S. 82 (1937). The transaction could qualify as a tax-free reorganization only under section 368(a)(1)(B), which applies when one corporation acquires stock of another corporation solely in exchange for voting stock of the acquirer and, thereafter, the acquirer controls the target. In the transaction described in the revenue ruling, however, the <u>Y</u> shareholders did not transfer their <u>Y</u> stock to <u>P</u> for <u>P</u> voting stock. They received their <u>P</u> stock from <u>S</u>, the acquisition subsidiary. And <u>P</u> received its <u>Y</u> stock not from former <u>Y</u> shareholders but instead in exchange for its <u>S</u> stock. Nonetheless, the Service concluded that the transaction qualified as a reorganization under section 368(a)(1)(B), reasoning as follows:

> It is evident that the shortest route to the end result * * * would have been achieved by a transfer of <u>P</u> voting stock directly to the shareholders of <u>Y</u> in exchange for their stock. This result is not negated because the transaction was cast in the form of a series of interrelated steps. The transitory existence of the new subsidiary, <u>S</u>, will be disregarded. The effect of all the steps taken in the series is that <u>Y</u> became a wholly owned subsidiary of <u>P</u>, and <u>P</u> transferred solely its voting stock to the former shareholders of <u>Y</u>. [Rev. Rul. 67-448, 1967-2 C.B. at 145.]

Petitioner fails to acknowledge potentially material differences between the facts posited in Rev. Rul. 67-448, <u>supra</u>, and those of its transaction. The results of the transaction in the ruling could be explained without reference to <u>S</u>. Though <u>P</u> did not actually receive its <u>Y</u> stock from <u>Y</u>'s former shareholders, it could have.

[*28] The Y stock that P ended up owning was the same type of stock that Y's former shareholders had owned. The ruling gives no indication that Y had more than one class of stock outstanding before the merger. By contrast, the results of the merger by which petitioner acquired OnNetworks cannot be readily explained without acknowledging the role played by petitioner's acquisition subsidiary. As noted above, the stock that petitioner ended up with--OnNetworks common stock--was not the type of stock held by those OnNetworks shareholders who participated in the merger. Treating the OnNetworks preferred shareholders as transferors in the exchange in which petitioner acquired the assets of the transferred business would require not only disregarding petitioner's acquisition subsidiary but also treating the OnNetworks preferred stock as being, in substance, common stock.

Petitioner suggests that, before the merger of its acquisition subsidiary into OnNetworks, "[t]he ONI Preferred Shareholders * * * represented all of ONI's remaining shareholders." That suggestion is factually inaccurate. The common stock of OnNetworks outstanding before the merger was not canceled until the effective time of the merger.

Petitioner may have in mind a notion similar to the principle employed in Helvering v. Ala. Asphaltic Limestone Co., 315 U.S. 179 (1942). In the

[*29] transaction at issue in that case, the taxpayer acquired the assets of an insolvent corporation of which its shareholders had been creditors. The taxpayer claimed that the acquisition had been a tax-free reorganization, so that its bases in the acquired assets equaled the insolvent corporation's bases in those assets (which apparently had exceeded their value at the time of the acquisition). The Commissioner claimed that the transaction could not have qualified as a reorganization because the shareholders of the insolvent corporation did not maintain a propriety interest in the taxpayer. The Court disagreed, reasoning that the equity interest in the insolvent corporation had shifted, at some point before the transaction in issue, from the corporation's shareholders to its creditors. As a practical matter, the shift occurred no later than when the creditors sought to enforce their claims against the insolvent corporation. "From that time on", the Court wrote, the creditors "had effective command over the disposition of the [debtor's] property." Id. at 183. Because of the debtor's insolvency, its assets were there for its creditors' taking.

By contrast, it is not obvious that the decline in value of OnNetworks assets below the liquidation preference of its preferred stock gave its preferred shareholders "effective command" over the disposition of the corporation's property. That the shareholder consent that approved the merger was joined by

**[*30]** one of OnNetworks' common shareholders suggests that the corporation's preferred shareholders did not have sufficient voting power, by themselves, to approve the transaction.[12] If the holders of the OnNetworks preferred stock could not have unilaterally approved the merger, or forced a liquidation of the corporation, they would have had less control over the disposition of the corporation's assets than the creditors of the insolvent corporation in <u>Ala. Asphaltic</u>.

Although we are not convinced that, as a matter of law, petitioner's acquisition of the assets of the transferred business was part of an exchange to which section 351 applies, we will treat it as such in disposing of the cases before us. Petitioner is the only party that would benefit from a determination that its acquisition of those assets was a taxable purchase and sale rather than a section 351 exchange. And it has steadfastly maintained that the acquisition is covered by

---

[12]Del. Code Ann. tit. 8, sec. 251(c) (West, Effective: July 16, 2020) requires that a merger involving a corporation be approved by a majority vote of its shareholders. Specification of a higher threshold for approval in a corporation's certificate of incorporation, however, may be given effect. See <u>Glazer v. Pasternak</u>, 693 A.2d 319 (Del. 1997).

[*31] section 351.  Moreover, the duty of consistency might prevent it from taking

a contrary position.[13]

---

[13]As we explained in Cluck v. Commissioner, 105 T.C. 324, 331 (1995), a "taxpayer owes the Commissioner the duty to be consistent in the tax treatment of items and will not be permitted to benefit from the taxpayer's own prior error or omission."  The duty applies when, after the expiration of the period of limitations on assessing tax for an earlier year, the taxpayer, for the purpose of determining its tax liability for a later year, seeks to take a position on an issue of fact contrary to reporting or representations on which the Commissioner relied, or to which he acquiesced, in regard to the earlier year.  See LeFever v. Commissioner, 103 T.C. 525, 543-544 (1994), supplemented by T.C. Memo. 1995-321, aff'd, 100 F.3d 778 (10th Cir. 1996); see also Herrington v. Commissioner, 854 F.2d 755, 758 (5th Cir. 1988) (accepting the taxpayers' argument that the duty of consistency is inapplicable "when the inconsistency concerns a pure question of law and both the taxpayer and the Commissioner had equal access to the facts"), aff'g Glass v. Commissioner, 87 T.C. 1087 (1986).  "[T]he duty of consistency is usually understood to encompass both the taxpayer and parties with sufficiently identical economic interests."  LeFever v. Commissioner, 100 F.3d at 788.  The question of whether OnNetworks preferred shareholders were transferors in the exchange by which petitioner acquired the assets of the transferred business may be a pure question of law.  But we cannot rule out the possibility that petitioner's abandonment of its sec. 351 theory would be contrary to factual representations made by CMH or its partners on which the Commissioner relied in determining the partners' tax liabilities for their taxable years ended December 31, 2009.  The period of limitations on assessing deficiencies in the partners' tax for those years would likely have expired by now in the absence of extensions.  See sec. 6501(a).  Were petitioner to abandon its claim that the exchange in issue was covered by sec. 351 and, in response, respondent invoked the duty of consistency, we would need to determine whether the economic interests of CMH and petitioner were sufficiently identical for representations made by CMH and its partners to be binding on petitioner.  It suffices for present purposes to note that, not only has petitioner consistently argued for the application of sec. 351; it might be prevented from arguing to the contrary.

[*32] Accepting that petitioner acquired the assets of the transferred business in a section 351 exchange, it follows that petitioner stepped into CMH's shoes in regard to the amortization of any amortizable section 197 intangibles included in the transfer. See sec. 197(f)(2); sec. 1.197-2(g)(2)(ii)(B), Income Tax Regs. Although $4,808 of the $204,808 of amortization petitioner claimed in respect of amortizable section 197 intangibles it acquired from CMH reflected amortization of carryover bases allowed by section 362(a), the deficiencies respondent determined for all of the years in issue were based on his disallowance of the entire $204,808 of claimed amortization.

At least through the day of the trial, respondent maintained that petitioner was not entitled to any of the $204,808 of amortization deductions claimed in respect of intangible assets it acquired from CMH. But the Stipulation of Facts that the parties executed on the day of trial suggests that respondent now accepts that petitioner is entitled to $4,808 of the $204,808 that he initially disallowed.

We thus do not understand respondent's repeated denials that petitioner acquired amortizable section 197 intangibles from CMH. The supplemental brief respondent filed in response to our order of April 24, 2020, includes the assertion that "[n]othing in the CM & JVA provides for a transfer of an intangible asset." That assertion is demonstrably incorrect. The CM & JV Agreement defines the

[*33] assets of the transferred business by reference to the Asset Purchase Agreement by which CMH acquired those assets from its subsidiaries. And the Asset Purchase Agreement includes "Intellectual Property", broadly defined, among the transferred assets.

Respondent's position may be explained, in part, by his apparent confusion about the relevant transaction. His supplemental brief also includes the assertion that "petitioner did not acquire amortizable assets as defined by section 97(d) [sic] in conjunction with the merger/reorganization transaction at issue." Although respondent consistently refers to the transaction in which petitioner acquired the assets of the transferred business as a "merger/reorganization", it was neither. Concurrently with petitioner's acquisition from CMH of the assets of the transferred business, petitioner's acquisition subsidiary merged into OnNetworks. But those two transactions were distinct. In the merger, petitioner exchanged the stock of its acquisition subsidiary for OnNetworks stock. It acquired nothing in the merger from CMH; the partnership did not participate in the merger.[14]

_____

[14]Although the qualification of the merger as a reorganization within the meaning of sec. 368(a)(1) has no apparent relevance to the issues before us, it is not clear that the merger did qualify. As respondent observes, the CM & JV Agreement expresses the intent of the parties to that agreement that the merger "qualify as a reorganization within the meaning of Section 368(a) of the Code". And petitioner claims that "[t]he merger was a reorganization within the meaning

(continued...)

**[*34]** Under the circumstances, we will take respondent as having accepted that the intangible assets that CMH had been amortizing before the transaction in issue were included among the assets of the transferred business, that those assets are amortizable section 197 intangibles, and that, consequently, petitioner is entitled to at least $4,808 of the amortization deduction it claimed for each year in respect of intangible assets it acquired from CMH. In addition to claiming in his

---

[14](...continued)
of IRC Section 368(a) and a reverse triangular merger within the meaning of section 368(a)(2)(E)." As noted in the text above, sec. 368(a)(1)(A) includes within the definition of the term "reorganization" "a statutory merger or consolidation". Sec. 368(a)(2)(E) provides that the use in a merger of stock of a parent corporation that controls the merged corporation does not prevent a merger from qualifying us a reorganization under sec. 368(a)(1)(A) if two requirements are met: First, "after the transaction, the corporation surviving the merger" must hold "substantially all of its properties and of the properties of the merged corporation (other than stock of the controlling corporation distributed in the transaction)". Sec. 368(a)(2)(E)(i). And second, the "former shareholders of the surviving corporation" must exchange a controlling interest in that corporation for voting stock of the parent of the merged corporation. Sec. 368(a)(2)(E)(ii). Because the OnNetworks common shareholders did not participate in the merger, sec. 368(a)(2)(E)(ii)'s control-for-voting-stock requirement may not have been met. The only stock exchanged in the merger for petitioner's voting stock was preferred stock of OnNetworks. And the consent of OnNetworks shareholders by which the merger was approved calls into question whether the corporation's preferred stock had at least 80% of the aggregate voting power of all of the corporation's voting stock. That may explain why the description of the expected Federal income tax consequences of the merger included in the Information Statement prepared in connection with the transaction states the expectation that the transaction would be tax free under sec. 351 but makes no mention of the nonrecognition rule that would apply if the transaction qualified as a reorganization.

**[\*35]** supplemental brief that petitioner did not acquire any amortizable section 197 intangibles in the "merger/reorganization", respondent asserts that he "properly disallowed petitioner's claimed amortization deduction in the amount of $200,000 in each taxable year at issue." If respondent now disputes only $200,000 of the $204,808 of annual amortization he initially disallowed, it follows that he concedes the deductibility of the $4,808 of amortization petitioner claimed in respect of carryover bases in amortizable section 197 intangibles it acquired from CMH. The remaining issue is thus whether petitioner is entitled to annual amortization of more than $4,808 in respect of amortizable section 197 intangibles included among the assets of the transferred business by reason of an increase in the bases of those assets reflecting gain CMH recognized in the exchange.

II.    Petitioner's Eligibility To Disavow Transactional Form

The amortization deductions petitioner claimed on its returns for the years in issue in respect of the assets it acquired from CMH rest on petitioner's disavowal of the form of the transactions implemented under the terms of the CM & JV Agreement and the Stock Repurchase Agreement. If the tax treatment of petitioner's acquisition of those assets were determined by the form prescribed by the governing agreements, CMH's transfer to petitioner of the assets of the transferred business would either be entitled to full nonrecognition treatment

**[*36]** under section 351(a) or instead be a fully taxable purchase and sale. The choice between those alternatives would depend on whether the OnNetworks preferred shareholders can appropriately be treated as transferors in the exchange. For the reasons explained supra part I.B., we will treat petitioner's acquisition of the assets of the transferred business as part of a section 351 exchange for the purpose of disposing of these cases.

Under the form of the transaction prescribed by the governing agreements, CMH's transfer of the assets of the transferred business and petitioner's redemption of some of the common shares CMH was entitled to receive for those assets were separate transactions (even though the effects of the redemption would be taken into account in applying section 351(a)'s control-immediately-after test). Accepting that the asset transfer was part of a section 351 exchange and determining the tax consequences of the transaction on the basis of its prescribed form would yield the results that (1) CMH recognized no gain or loss on the transfer, see sec. 351(a), (2) petitioner acquired each of the transferred assets with a basis equal to its basis in CMH's hands, see sec. 362(a), and (3) petitioner would not be entitled to amortization deductions in respect of the amortizable section 197 intangibles included among those assets beyond what respondent would allow.

**[*37]** By contrast, if we allowed petitioner to disavow the transactional form prescribed by the governing agreements, we would then need to consider whether the issuance and immediate redemption of 1,875,000 shares of petitioner's common stock should be respected for Federal income tax purposes. If not, we would treat petitioner as having acquired the assets of the transferred business in exchange for 3,124,000 of its common shares (4,999,000 – 1,875,000) and $3 million in cash, with $2.7 million paid at closing and a deferred payment of $300,000 to be made on January 3, 2011. Under that characterization of the transaction--again, accepting the application of section 351--CMH would have been required by section 351(b) to recognize gain in the transaction equal to the lesser of (1) its realized gain or (2) $2.7 million plus the fair market value, as of the closing date of November 25, 2009, of the $300,000 deferred payment right. (As explained infra part IV.A., CMH's failure to report any gain under section 351(b) would be of no consequence.) In that event, petitioner's bases in the amortizable section 197 intangibles included among the transferred assets would have been increased by that portion of CMH's recognized gain attributable to those assets. Petitioner would be entitled under section 1.197-2(g)(2)(ii)(B), Income Tax Regs., to amortize that increased basis ratably over a 15-year period beginning November 2009.

[*38] A.    The Parties' Arguments

      1.    Respondent

Respondent argues that petitioner cannot treat the cash and deferred payment right as taxable boot in the section 351 exchange because (1) the CM & JV Agreement provided that the sole consideration to which CMH was entitled in exchange for the transferred assets was 4,999,000 shares of petitioner's common stock, and (2) under the Stock Repurchase Agreement, CMH received the $2.7 million cash and $300,000 deferred payment right in redemption of 1,875,000 shares of petitioner's common stock.  Respondent variously describes petitioner as bound by either the terms of the relevant agreements or the form of the transactions carried out under the agreements.  In support of his position, respondent relies on Commissioner v. Nat'l Alfalfa Dehydrating & Milling Co., 417 U.S. 134 (1974), Commissioner v. Danielson, 378 F.2d 771 (3d Cir. 1967), vacating and remanding 44 T.C. 549 (1965), Makric Enters., Inc. v. Commissioner, T.C. Memo. 2016-44, aff'd, 683 F. App'x 282 (5th Cir. 2017), and Tseytin v. Commissioner, T.C. Memo. 2015-247, aff'd in part, remanded in part, 698 F. App'x 720 (3d Cir. 2017).

Nat'l Alfalfa includes an oft-quoted articulation of what is sometimes referred to as the "nondisavowal principle".  See, e.g., Dixon v. Commissioner,

**[*39]** T.C. Memo. 2006-90, 2006 WL 1157520, at *35, supplemented by T.C. Memo. 2006-190, aff'd, 621 F.3d 890 (9th Cir. 2010). In Commissioner v. Nat'l Alfalfa Dehydrating & Milling Co., 417 U.S. at 149, the Court wrote: "[W]hile a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not, * * * and may not enjoy the benefit of some other route he might have chosen to follow but did not."

Danielson involved a transaction in which shareholders of a target corporation sold their stock in that corporation and also entered into a covenant not to compete with the purchaser. Shortly before the closing of the transaction, the acquiring corporation inserted into the contracts governing the acquisition an allocation of the total consideration to be paid to the selling shareholders between their stock and the covenant not to compete. The shareholders, for whom any amount allocated to the covenant would have been ordinary income rather than capital gain (taxable at a lower rate), argued that the purported allocation in the contracts "d[id] not reflect the real agreement of the parties." Danielson v. Commissioner, 44 T.C. at 555. Although this Court agreed, the Court of Appeals for the Third Circuit reversed and remanded our decision, adopting the following rule of law: "[A] party can challenge the tax consequences of his agreement as

[*40] construed by the Commissioner only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc." Commissioner v. Danielson, 378 F.2d at 775. According to respondent: "CMI has not challenged the * * * Agreements [governing the transactions at issue] on the grounds of fraud, mistake, undue influence, duress, or the like. The Danielson rule therefore prohibits CMI from challenging the express terms and contractual provisions of [the] agreements. This rule also precludes the Court from admitting or considering contradictory or supplemental testimony at trial."

Makric involved the sale by a holding company of the stock of its operating subsidiary (Alpha) to a third party purchaser (TS3). For tax reasons, the Makric shareholders had apparently intended to sell their Makric stock to TS3 (in which case, their gain would have been taxed at the 15% capital gain rate). But the agreements actually executed provided for Makric's sale of its Alpha stock. Contrary to the terms of the agreement, Makric and its shareholders reported the transaction in accordance with the shareholders' intentions: The shareholders reported gain as if they had sold their Makric stock; Makric reported no gain. When the Commissioner determined a deficiency in Makric's corporate income tax, Makric argued that its sale of the Alpha stock should be disregarded and its

[*41] shareholders treated as having sold their stock in Makric itself. We rejected that argument, holding that "the Danielson rule bars Makric from contending that in substance the stock purchase agreement is for the sale of Makric." Makric Enters., Inc. v. Commissioner, at *52. (We applied the Third Circuit's Danielson rule, despite our own contrary holding in that case, because an appeal of Makric would have been to the Court of Appeals for the Fifth Circuit, which, we observed, "has applied the Danielson rule in several cases". Id. at *42; see also Golsen v. Commissioner, 54 T.C. 742, 757 (1970) ("[B]etter judicial administration * * * requires us to follow a Court of Appeals decision which is squarely in point where appeal from our decision lies to that Court of Appeals and to that court alone."), aff'd, 445 F.2d 985 (10th Cir. 1971).)

Tseytin involved an individual who owned 75% of the stock of a corporation, USSI, that operated fast food franchises in Russia. Another entity, Archer, owned the remaining 25% of the USSI stock. A Dutch corporation, AmRest, was interested in acquiring USSI. During negotiations with AmRest, the taxpayer bought Archer's USSI stock. AmRest then acquired USSI by merger. In the merger, the taxpayer received cash and AmRest stock. The per-share value of the merger consideration was apparently less than the price the taxpayer had paid to Archer for its USSI stock. Under the applicable statutory provisions, the

[*42] taxpayer would have been required to recognize the gain on his original shares to the extent of the cash he received for those shares but would have been unable to recognize any loss on the shares he acquired from Archer. Before this Court, the taxpayer argued, among other things, that he had never been the true owner of the Archer shares but had instead acquired them and then surrendered them in the merger as Archer's agent.

Because Tseytin was appealable to the Court of Appeals for Third Circuit, we viewed ourselves as bound by Danielson. Observing that the taxpayer "ha[d] not challenged the agreements * * * [governing the transaction] on the grounds of fraud, mistake, undue influence, duress, or the like", we concluded that "the Danielson rule * * * prohibited * * * [the taxpayer] from challenging the form of the transactions" in issue. Tseytin v. Commissioner, at *15.

### 2. Petitioner

Petitioner only obliquely acknowledges that its position involves a disavowal of the form in which the relevant transactions were structured. At one point in its opening brief, petitioner asserts that "there was no redemption of stock from CMH." It acknowledges that the agreements "envisioned" a redemption of 1,875,000 of the shares of common stock that it was required to issue to CMH in exchange for the assets of the transferred business, but claims that the redemption

**[\*43]** "did not happen." Petitioner apparently relies on its issuance to CMH of a certificate representing only 3,125,000 shares of its common stock.

Notwithstanding its claim that the redemption did not actually happen, petitioner devotes considerable attention to the step transaction doctrine, the applicability of which would be irrelevant if, in actual form, the transaction had involved only one step instead of two--that is, if petitioner had acquired the assets of the transferred business in exchange for 3,124,000 shares of its common stock and $3 million in current and deferred cash payments, instead of acquiring those assets for 4,999,000 shares of common stock and then immediately redeeming 1,875,000 of those shares in exchange for the cash payments.

Petitioner is also circumspect in acknowledging the nondisavowal principle most clearly expressed in the Supreme Court's opinion in Nat'l Alfalfa. Petitioner claims that the Danielson rule does not apply to the cases before us because they would be appealable to the Court of Appeals for the Second Circuit rather than to that of the Third Circuit. Petitioner does, however, accept the potential application of the "strong proof" rule associated with the Court of Appeals' opinion in Ullman v. Commissioner, 264 F.2d 305 (2d Cir. 1959), aff'g 29 T.C. 129 (1957). Ullman, like Danielson, involved an allocation of purchase price between stock and covenants not to compete executed between selling

[*44] shareholders and the purchaser. In Ullman v. Commissioner, 264 F.2d at

308, the Court of Appeals opined that "when the parties to a transaction such as

this one have specifically set out the covenants in the contract and have there

given them an assigned value, strong proof must be adduced by them in order to

overcome that declaration." Petitioner argues:

> Under the "strong proof" standard * * * the Taxpayer's ability to
> make * * * a "substance over form" argument is less circumscribed
> [than under the Danielson rule]. The Taxpayer need not show the
> written agreement is unambiguous or unenforceable as between the
> parties but nonetheless (because the tax treatment set forth in the
> writing was presumably negotiated for among tax adverse parties)
> must produce "strong proof" showing that the agreement does not
> comport with the actual economic reality.

But petitioner does not claim to have satisfied the strong proof test by

establishing that the provisions of the agreements governing its transactions depart

from economic reality. Instead, petitioner argues that the strong proof test does

not apply. Petitioner infers that the Ullman strong proof test addresses the same

policy concerns articulated in Danielson. And petitioner argues that, because its

cases do not present those concerns, the strong proof test is inapplicable.

In its opinion in Danielson, the Third Circuit identified three concerns

raised by the prospect of allowing parties who entered into a covenant not to

compete to disavow an agreed allocation of consideration to the covenant. First,

[*45] recognizing that a buyer of stock might be willing to pay more total consideration the larger the portion of that consideration allocated to an amortizable covenant not to compete, the court reasoned: "[T]o permit a party to an agreement fixing an explicit amount for the covenant not to compete to attack that provision for tax purposes, absent proof of the type which would negate it in an action between the parties, would be in effect to grant, at the instance of a party, a unilateral reformation of the contract with a resulting unjust enrichment." Commissioner v. Danielson, 378 F.2d at 775. Second, "such attacks would nullify the reasonably predictable tax consequences of the agreement to the other party thereto." Id. And third, "this type of attack would cause the Commissioner considerable problems in the collection of taxes." Id. While the sellers might challenge the economic reality of the agreement, the buyer, seeking to preserve its amortization deductions, might defend the agreement, claiming that the compensation to the sellers for bearing the tax burden of ordinary income rather than capital gain imbued the agreement with economic reality. Faced with these competing positions, the Commissioner would need to litigate with both (or all) parties to ensure collection of the proper amount of tax.

Petitioner argues that the cases before us present none of the concerns underlying the Danielson rule and the strong proof test:

CMI is not a party which previously negotiated terms of a business arrangement with other parties which terms give rise to a particular tax treatment and is now taking a different position on its tax return and attempting to support that position in litigation with the Respondent by offering proof that the written agreement did not mean what it says.

All of the parties to the CMJVA and the related agreements treated the transaction consistently. Gerszberg, the CMH member whose interest was retired with the cash received from CMI, reported the funds as income on his Form 1040 returns for 2009 and 2011 and CMI treated the payment as "boot", stepped up its basis in the intangibles and claimed amortization deductions from the outset in November 2009 using the stepped up basis. * * *

There is no whipsaw potentially requiring the Respondent to litigate against multiple parties nor is any party to the underlying transactions denied the benefit of its bargain or unjustly enriched by allowing the Petitioner to offer testimony and other evidence at issue here.

Indeed, the parties to the written agreements at issue here did not negotiate for a tax allocation which would have precluded CMI's claimed step up in basis or have differing interests regarding whether CMI could claim a step up in basis. To the contrary, the parties in multiple places in their contemporaneous agreements cross-referenced all the other agreements and agreed the money paid to Gerszberg was "boot" and was taxable to him. * * * Gerszberg did not disagree and reported the gain in full. * * *

Since none of the policy consideration [sic] behind either the Danielson and the "strong proof" rules are implicated, neither rule applies. * * * Petitioner is not attempting to change the terms of its CMJVA transaction to obtain a tax treatment it did not bargain for with the other contracting parties.

**[*47]** B.     Analysis

Both parties have been somewhat casual in distinguishing between a taxpayer's disavowal of the terms of a contract and disavowal of the form of the transactions implemented under those terms.  Petitioner insists that it "is not attempting to in any way vary the terms of the operative agreements".  At the same time, it alleges that "there was never any redemption of 1,875,000 shares of Petitioner's common stock."  If petitioner means that the transactional form was other than a transfer of assets for stock and an immediate redemption of some of that stock, it is disavowing the terms of the relevant agreements, which clearly provide for those two separate steps.  If petitioner instead refers only to its failure to issue a certificate representing the 4,999,000 common shares it was required to issue and then immediately redeem, that claim, though supported by the record, is irrelevant.

Petitioner has given us no reason to conclude that the contracts governing the transactions in issue were unenforceable or should be interpreted other than as respondent interprets them.  By their plain terms, those agreements called for CMH to transfer to petitioner the assets of the transferred business in exchange for 4,999,000 shares of petitioner's common stock and for petitioner to immediately redeem 1,875,000 of those shares for $2.7 million of cash and the right to receive

[*48] an additional deferred cash payment of $300,000. The terms of the agreements establish the transactional form. We turn now to the question of whether petitioner is bound by the form of its transactions.

1. Is Petitioner Necessarily Bound by the Form of the Transactions?

The cases respondent cites do not erect an absolute bar to petitioner's disavowal of the form of its transactions. Granted, Nat'l Alfalfa's oft-quoted articulation of the nondisavowal principle would, if read in isolation, suggest an absolute prohibition. But, read in the context of the Court's entire opinion, the familiar quotation should be interpreted to mean only that a taxpayer's ability to identify an alternative path to a given end result that provides more favorable tax consequences than the path actually taken is not enough to entitle the taxpayer to the desired tax treatment.

Nat'l Alfalfa involved a corporation that had issued preferred stock at its par value and then, some years later, redeemed the stock by issuing bonds with a face value equal to the par value of the preferred. The interest rate on the debentures equaled the cumulative dividend rate on the preferred. The corporation, however, claimed that the preferred stock was worth less than its par value when it was redeemed. On the basis of that claim, the corporation sought to amortize as

**[\*49]** additional interest expense over the term of the debentures the excess of their face amount over the allegedly lower market value of the preferred stock.

The Court denied the taxpayer's amortization of bond discount, concluding that the corporation had failed to demonstrate that, in exchanging the debentures for the preferred stock, it had "incurred any additional cost for the use of capital." Commissioner v. Nat'l Alfalfa Dehydrating & Milling Co., 417 U.S. at 151. The Court viewed the exchange as simply substituting one obligation for another. As the Court explained: "The capital 'freed' by the cancellation of the preferred was merely transferred to the liability account for the debentures. No new capital was involved." Id. at 153. The Court acknowledged that, by substituting debt for equity, the corporation had effected some change in its corporate structure, but the Court dismissed the change as "not great." Id. In the Court's view, capital is capital. "[T]he alteration in the form of the retained capital", the Court concluded, "did not give rise to any cost of borrowing". Id. at 154.

In upholding the taxpayer's deductions, the Court of Appeals for the Tenth Circuit had analogized the transaction to a cash issuance of debentures for less than their face amount with the proceeds used to retire the preferred stock. Accepting that argument, the Court wrote, would have required it to "take two steps that * * * [it was] reluctant and unwilling to take." Id. at 148. First, it would

**[*50]** have "require[d] rejection of the established tax principle that a transaction is to be given its tax effect in accord with what actually occurred and not in accord with what might have occurred." Id. And second, accepting the hypothetical alternative transaction argument would have required the Court "to speculate about the market price and value to the corporation of the debentures in question had they been sold upon the open market." Id. The Court then offered its oft-quoted articulation of the nondisavowal principle to the effect that a taxpayer, having made its bed, has to sleep in it.

Read in context, as a response to the appellate court's argument about the availability of an alternative transaction, the Court's articulation of the nondisavowal principle, again, simply means that a taxpayer's ability to posit an alternative transaction that would have reached a more favorable tax result than a transaction actually carried out is not enough to entitle the taxpayer to the more favorable treatment. The facts of Nat'l Alfalfa provided no grounds for concluding that the hypothetical alternative transaction would have better reflected the economic substance of the events than the transactional form actually employed. In fact, the posited alternative differed from the actual transaction in a respect germane to the taxpayer's entitlement to the claimed discount: If the taxpayer had actually issued bonds for a cash price less than their face amount, the transaction

[*51] would have reliably established both the existence and amount of discount. As applied to the facts of the cases before us, Nat'l Alfalfa thus establishes only that petitioner cannot justify the claimed amortization deductions merely by observing that it would have been entitled to a step-up in the bases of the transferred assets had the $2.7 million of cash and $300,000 deferred payment right been boot in the section 351 exchange.

Although Danielson itself did not involve a choice between the form of a transaction and its alleged substance, this Court and others have extended the Danielson rule to limit a taxpayer's eligibility to challenge not only the terms of the contracts governing a transaction but also the form of the transactions as established by those contractual terms. The Court of Appeals recognized in Danielson that the case did not implicate the doctrine that the tax consequences of transactions should generally be determined on the basis of their economic substance rather than their form. In the court's words, the case did not "involve[] * * * a situation where the Commissioner is attacking the transaction in the form selected by the parties". Commissioner v. Danielson, 378 F.2d at 774. Instead, the Commissioner was "attempting to hold a party to his agreement unless that party can show in effect that it is not truly the agreement of the parties." Id. at 775.

**[*52]** This Court has long accepted, however, that both the <u>Danielson</u> rule and <u>Ullman</u>'s "strong proof" test "apply beyond the confines of allocating payments to a covenant not to compete." <u>Coleman v. Commissioner</u>, 87 T.C. 178, 202 (1986), <u>aff'd without published opinion</u>, 833 F.2d 303 (3d Cir. 1987). In fact, <u>Coleman</u> (a case appealable to the Third Circuit) can be understood as an application of the <u>Danielson</u> rule to prevent a taxpayer from arguing that a cross-border transaction structured as a lease was in substance a sale. And, as noted <u>supra</u> part II.A.1., we invoked the <u>Danielson</u> rule in <u>Tseytin v. Commissioner</u>, at *15, to prevent the taxpayer "from challenging the form of the transactions before us." In affirming in part our decision in <u>Tseytin</u>, the Third Circuit also treated the <u>Danielson</u> rule as extending, beyond its origin, to the substance-over-form doctrine. The Court of Appeals equated its own <u>Danielson</u> rule with <u>Nat'l Alfalfa</u>'s articulation of the nondisavowal principle and wrote that "[a] taxpayer who falls within the scope of th[e] rule * * * is stuck with the form of his business transaction, and can make an argument that substance should prevail over that form only if a limited class of exceptions applies, for example, if the taxpayer was fraudulently induced into the

**[\*53]** deal, or there has been a material breach." <u>Tseytin v. Commissioner</u>, 698 F.

App'x at 723.[15]

To the extent that the <u>Danielson</u> rule limits a taxpayer's eligibility to

disavow the form of its transactions as well as the terms of the contracts that

govern those transactions, however, the rule has no application to the cases before

us. This Court has never accepted the <u>Danielson</u> rule.[16] And, because the cases

---

[15]The Third Circuit's description of the <u>Danielson</u> rule in <u>Tseytin v. Commissioner</u>, 698 F. App'x 720, 723 (3d Cir. 2017), <u>aff'g in part, remanding in part</u> T.C. Memo. 2015-247, appears to conflate the disavowal of contract terms and the disavowal of transactional form. A taxpayer's failure to establish fraudulent inducement, material breach, or other grounds that would render unenforceable the contracts governing a transaction means only that the contractual terms define the form of the transaction. The enforceability of the contracts and the extent to which the transactional form they determine reflects economic substance are separate questions. While there may be reasons to limit a taxpayer's eligibility to disavow transactional form, the conditions the taxpayer should have to meet to do so need not be the same conditions that apply in determining whether the taxpayer may disavow the terms of the contracts that establish the transactional form.

[16]In <u>Schmitz v. Commissioner</u>, 51 T.C. 306, 316 (1968), <u>aff'd sub nom. Throndson v. Commissioner</u>, 457 F.2d 1022 (9th Cir. 1972), we declined the invitation of one of the parties before us to apply the <u>Danielson</u> rule in a case appealable to the Court of Appeals for the Ninth Circuit, explaining that our adoption of that rule "would * * * endorse a formalistic policy akin to caveat emptor by announcing that this Court will no longer permit the showing of strong proof to realign the lopsided tax consequences produced by an agreement having no rational basis with economic or business reality." <u>But see</u> <u>Estate of Rogers v. Commissioner</u>, T.C. Memo. 1970-192, 1970 Tax Ct. Memo LEXIS 166, at \*14 (declining to adopt the "one-way street" approach of <u>Danielson</u> but suggesting

(continued...)

[*54] before us are not appealable to the Third Circuit (or to any other appellate court that has accepted the Danielson rule), the Golsen doctrine does not require us to apply that rule here.

As noted supra part II.A.1., we applied the Danielson rule in Makric and Tseytin; but Makric was appealable to the Fifth Circuit (which, as we noted in our opinion in that case, had applied the Danielson rule "in several cases", Makric Enters., Inc. v. Commissioner, at *42), and Tseytin was appealable to the Third Circuit. Moreover, we recognized in Makric that "[t]he substance-over-form doctrine can be invoked by either the government or the taxpayer." Id. at *39. And, while we concluded that the holding company in Makric was barred by the Danielson rule from contending that the agreement calling for its sale of its subsidiary's stock was "in substance * * * for" its shareholders' sale of its own stock, we went on to address the taxpayer's substance-over-form argument on the merits. Similarly, in Tseytin v. Commissioner, T.C. Memo. 2015-247, we would have reached the same result regardless of the Danielson rule. Tseytin, again, was the case in which the taxpayer sought to disavow his purchase of the target corporation stock owned by the corporation's other shareholder (Archer) before

---

[16](...continued)
that, in practical consequence "the difference between 'strong proof' and proof of 'unenforceability' may not be great"), aff'd, 445 F.2d 1020 (2d Cir. 1971).

[*55] surrendering all of that stock in a merger with an acquiring corporation (AmRest). After concluding that the Danielson rule prohibited the taxpayer in Tseytin "from challenging the form of the transactions" in issue, we went on to note that, even if the taxpayer "were not bound by the form of the transactions he entered into, the stipulated evidence convincingly supports the conclusion that * * * [the taxpayer] purchased the Archer shares from Archer on his own behalf and then transferred them to AmRest." Tseytin v. Commissioner, at *15.

In sum, petitioner's ineligibility to invoke grounds that would render its contracts unenforceable or call into question respondent's interpretation of those contracts does not prevent it from disavowing the form of the transactions implemented under them. We now turn to the question of what petitioner must show to disavow the form of the transactions. Is the substance-over-form doctrine, as we have sometimes said, as readily available to a taxpayer as it would be to the Commissioner (were he challenging the transactional form), so that the taxpayer need only show a disparity between the form of the transaction and its economic substance? Or, as we have suggested on other occasions, does the taxpayer have to show more and, if so, what is the nature and quantum of the required additional showing?

**[\*56]**      2.      <u>What (and How Much) Must a Taxpayer Show To Disavow the Form of Its Transactions?</u>

At one time, this Court and its predecessor were less willing than appellate courts to allow a taxpayer, having chosen the form of a transaction, to disavow that form and argue that the tax consequences of the transaction should be determined on some other basis.  For example, in <u>Swiss Oil Corp. v. Commissioner</u>, 32 B.T.A. 777, 785 (1935), <u>rev'd sub nom.</u> <u>Commissioner v. Ashland Oil & Refining Co.</u>, 99 F.2d 588 (6th Cir. 1938), the Board of Tax Appeals wrote:  "Although courts have a tendency at times to 'look through form to substance', they nevertheless have laid down the rule that tax liability must be determined by considering what the taxpayer did, not what it intended to do, or what it might have done."  And in <u>J.M. Turner & Co. v. Commissioner</u>, 26 T.C. 795 (1956), <u>rev'd</u>, 247 F.2d 370 (4th Cir. 1957), this Court, while acknowledging that the taxpayer could have achieved the tax benefit sought had it structured the transaction in issue differently, nonetheless held the taxpayer to the form of its transaction.  "[I]n deciding the present controversy," we wrote, "it is necessary for us to deal with the facts and transactions as they actually existed."  <u>Id.</u> at 804.  In <u>Television Indus., Inc. v. Commissioner</u>, 32 T.C. 1297, 1302 (1959), <u>aff'd</u>, 284 F.2d 322 (2d Cir. 1960), we again recognized that the taxpayer could have avoided

[*57] tax liability had the transaction in issue been cast in a different form.  But

the transaction "was not done in that [tax-favorable] way," we concluded, "and the

form that the transaction took must prevail."  Id.  We felt ourselves bound to

render our decision "upon the basis of what was actually done rather than upon

what might have been done."  Id.

By contrast, in our own Opinion in Danielson v. Commissioner, 44 T.C. at

555, we wrote:  "We are unwilling to abdicate our judicial responsibility of

examining the substance of a transaction.  We are not bound by its form."  And in

Schmitz v. Commissioner, 51 T.C. 306 (1968), aff'd sub nom. Throndson v.

Commissioner, 457 F.2d 1022 (9th Cir. 1972), in addition to declining to adopt the

Third Circuit's Danielson rule, we suggested that the substance-over-form doctrine

is equally available to taxpayers and the Commissioner.  We acknowledged that,

in many of the cases in which the doctrine had been applied, "the Commissioner

was attacking the form of the transaction".  Id. at 317.  But we also saw "no reason

why we should make a distinction on this point."  Id.; see also Shaw v.

Commissioner, 59 T.C. 375, 383-384 (1972) ("Th[e] preference for substance over

form in tax matters extends to claims of petitioner and respondent alike.").

In Estate of Rogers v. Commissioner, T.C. Memo. 1970-192, 1970 Tax Ct.

Memo LEXIS 166, aff'd, 445 F.2d 1020 (2d Cir. 1971), we again had occasion (as

**[\*58]** in <u>Danielson</u>) to apply <u>Ullman</u>'s "strong proof" rule.  We accepted that "a taxpayer may go beyond what appears on the face of an agreement, just as the Commissioner may do so."  <u>Id.</u>, 1970 Tax Ct. Memo LEXIS 166, at \*13.  But, we observed, "the so-called 'two-way street' seems to run downhill for the Commissioner and uphill for the taxpayer."  <u>Id.</u> at \*14.  "The Commissioner must be permitted to go beyond mere form to substance in order to protect the revenue", we explained, "but taxpayers have the opportunity at the outset to choose the most advantageous arrangement."  <u>Id.</u>

In <u>Glacier State Elec. Supply Co. v. Commissioner</u>, 80 T.C. 1047 (1983), we suggested that the higher burden faced by a taxpayer seeking to disavow the form of its transaction might be an evidentiary one.  We agreed with the taxpayer, who sought to recharacterize the transaction in issue, that "it is the substance of a transaction rather than mere form which should determine the resultant tax consequences when the form does not coincide with economic reality."  <u>Id.</u> at 1053.  We also accepted that "[t]he taxpayer, as well as the Commissioner, is entitled to assert the substance-over-form argument" but added that, "in such situations the taxpayer may face a higher than usual burden of proof."  <u>Id.</u>

In <u>Glacier State Elec. Supply</u>, however, we did not clearly articulate just what the taxpayer should have to prove by more than a preponderance of the

**[*59]** evidence. We ultimately rejected the taxpayer's substance-over-form argument on the grounds that "the substance of the transaction coincides with the form employed." Id. at 1058. We did not identify any factual questions whose resolution would have compelled a different result if the taxpayer had met a heightened standard of proof.

In Coleman v. Commissioner, 87 T.C. 178, we suggested that a taxpayer faces a particularly high threshold in seeking to disavow the form of a transaction chosen to allow another party tax benefits (even under foreign tax law) that are inconsistent with the treatment the taxpayer seeks before us. Coleman involved an equipment lease originally structured between counterparties in the United Kingdom with the intent that the lessor be respected as the equipment's owner and thus entitled to generous first-year depreciation allowed under U.K. tax law. The taxpayer before us was a U.S. partner in a partnership that had acquired the lessee's interest in the lease. The taxpayer argued that, under U.S. tax principles, the partnership should be treated as the owner of the equipment and thus entitled to allocate among its partners depreciation deductions in respect of the equipment. We repeated the observation we had made in Bolger v. Commissioner, 59 T.C. 760, 767 n.4 (1973), that "the taxpayer may have less freedom than the Commissioner to ignore the transactional form * * * adopted." Coleman v.

[*60] Commissioner, 87 T.C. at 202. We then opined that "this is particularly true where * * * the form of the transaction was adopted * * * in order to achieve a bona fide, permissible tax purpose." Id. And the relevant analysis apparently does not turn on whether the tax purpose motivating the choice of transaction structure involves U.S. or foreign taxes. As we explained:

> The fact that the purpose underlying the form of the transactions between * * * [the original lessee and lessor] was to take advantage of U.K. rather than U.S. tax laws does not, in our opinion, provide a sufficient foundation for permitting petitioners to disavow that form in order to obtain the benefits of U.S. tax laws. Similarly, we consider it irrelevant that * * * [the original counterparties] were apparently not subject to U.S. tax laws. Rather, we think our decision herein should be based upon the situation which would have existed had both * * * [of the original counterparties] been subject to U.S. tax laws * * * and sought to claim depreciation in respect of the Equipment.

Id. at 202-203.

In Estate of Durkin v. Commissioner, 99 T.C. 561 (1992), we identified other factors that tend to weigh against a taxpayer who seeks to disavow a transaction's form. The taxpayers in Estate of Durkin took a position contrary to their own tax reporting of the transactions in issue after the Commissioner had challenged their reporting. The taxpayers' "disavow[al] [of] their own tax return treatment", their failure to "show 'an honest and consistent respect for the substance of * * * [the] transaction'", and their "unilateral[] attempt[]" to recast the

[*61] transaction only "after it has been challenged" all weighed against our acceptance of their proposed step transaction recast.  Id. at 574-575 (quoting Estate of Weinert v. Commissioner, 294 F.2d 750, 755 (5th Cir. 1961), rev'g and remanding 31 T.C. 918 (1959)).  We also invoked in Estate of Durkin two of the three policy considerations underlying the Danielson rule:[17]  "A party disavowing the form of a transaction may be unjustly enriched, particularly where the party was acting on tax advice, because the price may be influenced by tax considerations.  If a party disavows the form of a transaction, the Commissioner may be whipsawed between one party claiming taxation based on the form, and the opposite party claiming taxation based on the substance."  Id. at 575 (citation omitted).

Dyess v. Commissioner, T.C. Memo. 1993-219, 1993 WL 170147, at *10, aff'd without published opinion, 26 F.3d 1119 (5th Cir. 1994), similarly involved the rejection of a step transaction argument made by a taxpayer who, we concluded, had "met neither the strong proof test nor the Danielson test".  Our

---

[17]Although Estate of Durkin v. Commissioner, 99 T.C. 561 (1992), was appealable to the Court of Appeals for the Third Circuit, we found it unnecessary in that case to choose between that court's Danielson rule and the "strong proof" rule we had ourselves posited in Glacier State Elec. Supply Co. v. Commissioner, 80 T.C. 1047 (1983).  Under either standard, we reasoned in Estate of Durkin v. Commissioner, 99 T.C. at 574, the taxpayers before us would not have been allowed to disavow the form of the transaction in issue.

[*62] conclusion rested in part on the taxpayer's failure to explain why the transaction structure employed was chosen over a considered-and-rejected alternative that would have achieved the tax results the taxpayer sought. Dyess involved a sale of real property between two partnerships. At issue was whether section 707(b)(2)(B) applied to recharacterize the seller's gain as ordinary income. As then in effect, the recharacterization rule would have applied if the same persons owned more than 80% of the capital and profits of both partnerships. When the sale occurred, the taxpayer and another individual (Nace) owned all of the interests in the selling partnership (Equity) and 92.5% of the interests in the buyer (Foxfire). Nonetheless, the taxpayer argued that section 707(b)(2)(B) did not apply because the sale occurred in anticipation of Foxfire's issuance of limited partner interests to new investors that reduced his and Nace's ownership of Foxfire below 80%. The whole purpose of forming a new limited partnership to acquire the property, according to the taxpayer, was to raise money from new investors in an effort to rehabilitate a failing development.

An earlier draft of Foxfire's limited partnership agreement had contemplated the issuance of 75% of the interests in the partnership to limited partners before Foxfire's acquisition of the property in question from Equity. We found no "satisfactory explanation" in the record "as to why that draft version was not

**[\*63]** used." <u>Dyess v. Commissioner</u>, 1993 WL 170147, at \*10. The taxpayer, we

concluded, "cannot now disavow the route he in fact followed for a different route

he might have but did not take." <u>Id.</u> The taxpayer had "met neither the strong

proof test nor the <u>Danielson</u> test".[18] <u>Id.</u> Therefore, the taxpayer could not

"successfully invoke the substance over form doctrine to disavow the manner in

which the Foxfire partnership was structured and the limited partnership interests

sold." <u>Id.</u>

In sum, as our caselaw has evolved, it has become more hospitable to

taxpayers seeking to disavow the form of their transactions. While we no longer

reject those arguments out of hand, as we did in <u>Swiss Oil Corp.</u>, <u>J.M. Turner &</u>

<u>Co.</u>, and <u>Television Indus.</u>, we have repeatedly indicated that taxpayers may face a

higher burden than the Commissioner does in challenging transactional form. On

occasion, as in <u>Glacier State Elec. Supply</u>, we have suggested that the taxpayer's

higher burden might be an evidentiary one. But we have not identified specific

factual questions that should be subject to a higher burden than that imposed by

Rule 142(a) or articulated the quantum of evidence necessary to meet that burden.

---

[18]We accepted in <u>Dyess v. Commissioner</u>, T.C. Memo. 1993-219, 1993 WL 170147, at \*8, <u>aff'd without published opinion</u>, 26 F.3d 1119 (5th Cir. 1994), the possibility that the <u>Danielson</u> rule might apply in that case because the Court of Appeals for the Fifth Circuit, to which the case was appealable, had chosen the <u>Danielson</u> rule over the strong proof rule in "certain situations".

**[*64]** Nor have we offered a clear justification for imposing on the taxpayer a higher burden to prove facts relevant to the disavowal of form than the generally applicable preponderance of the evidence standard.

Therefore, we now conclude that the additional burden the taxpayer has to meet in disavowing transactional form relates not to the quantum of evidence but instead to its content--not how much evidence but what that evidence must show by the usual preponderance.  The Commissioner can succeed in disregarding the form of a transaction by showing that the form in which the taxpayer cast the transaction does not reflect its economic substance.  For the taxpayer to disavow the form it chose (or at least acquiesced to), it must make that showing and more.  In particular, the taxpayer must establish that the form of the transaction was not chosen for the purpose of obtaining tax benefits (to either the taxpayer itself, as in Estate of Durkin, or to a counterparty, as in Coleman) that are inconsistent with those the taxpayer seeks through disregarding that form.  When the form that the taxpayer seeks to disavow was chosen for reasons other than providing tax benefits inconsistent with those the taxpayer seeks, the policy concerns articulated in Danielson will not be present.

**[*65]**      3.      Has Petitioner Made the Required Showing?

For the reasons explained above, petitioner, in claiming that the policy concerns underlying Danielson are not present here, is arguing along the right lines. But the matter is less straightforward than petitioner acknowledges.

Petitioner suggests that the two-step transaction, involving the issuance and immediate redemption of 1,875,000 of its common shares, does not "give rise to a particular tax treatment" that is inconsistent with the result it now seeks. We are not convinced, however, that petitioner is correct. If the form of the transaction is respected, the resulting taxable income to CMH might be less than if the partnership were treated as having received the $2.7 million cash and $300,000 deferred payment right as boot in the section 351 exchange. The difference turns on the different "stacking" rules that would apply in determining the basis recovery allowable to CMH. As explained below, in the redemption scenario, CMH would be entitled to basis recovery before gain. By contrast, taxable boot in a section 351 exchange is treated as gain first and as recovery of basis only to the extent that the boot exceeds the transferor's realized gain.

If the transaction were taxed in accordance with its form, the redemption of petitioner's stock would be tested for dividend equivalence under section 302. If, as our calculations indicate, CMH continued to own after the redemption a

**[\*66]** majority of petitioner's voting stock, the redemption would likely not qualify for exchange treatment under section 302(b).  See, e.g., Rev. Rul. 78-401, 1978-2 C.B. 127.  In that case, the redemption would be treated under section 302(d) "as a distribution of property to which section 301 applies."  As such, the distribution would be treated as a dividend to the extent of petitioner's earnings and profits as of the end of 2009.  See secs. 301(c)(1), 316.  While the record does not allow us to precisely calculate petitioner's earnings and profits, if its earnings and profits roughly equaled its retained earnings, no more than about $80,000 of the almost $3 million distribution would have been treated as a dividend under sections 301(c)(1) and 316.  Next, the distribution would have to be treated as a return of CMH's basis in its stock in petitioner, see sec. 301(c)(2), which would have equaled the basis of the assets CMH transferred to petitioner, see sec. 358(a)(1).[19] To the extent that the distribution exceeded both petitioner's earnings and profits and CMH's basis in its stock in petitioner, CMH would recognize capital gain. See sec. 301(c)(3).

By contrast, if the issuance and immediate redemption of 1,875,000 of petitioner's common shares were disregarded and CMH were treated as having

---

[19]The basis of the transferred assets was approximately $265,000.  See infra note 25.

[*67] received the $2.7 million and the right to a deferred payment of $300,000 in the section 351 exchange, CMH would have recognized its realized gain to the extent of the value of the nonstock consideration it received. See sec. 351(b)(1). As explained infra part IV.A., CMH's gain would be determined on an asset-by-asset basis, allocating the taxable boot among the transferred assets in proportion to their relative values. CMH would recognize gain in each asset to the extent that its realized gain did not exceed the boot allocable to that asset. Because the value of the boot was roughly 37.5% of the total value of the assets of the transferred business (about $3,000,000 ÷ $8,000,000), CMH would have been allowed to recover all or part of the basis of an asset only if that basis exceeded about 62.5% percent of the asset's value.[20]

Petitioner also overstates the case when it claims that "[a]ll of the parties to the CMJVA and the related agreements treated the transaction consistently." CMH did not report as taxable boot in a section 351 exchange its receipt from petitioner of $2.7 million in cash and the right an additional payment of $300,000 on January 3, 2011. Although the partnership's 2009 return included a disclosure statement treating its transfer of assets to petitioner as a section 351 exchange, in

---

[20]The parties agree that the fair market value of the transferred assets that petitioner and CMH reported in their disclosures under sec. 1.351-3, Income Tax Regs., is correct. See infra note 25.

[*68] computing its taxable income, it did not take into account at all its receipt of cash and the deferred payment right. And while Mr. Gerszberg reported gain, he attributed all of that gain to the redemption of his interest in CMH and treated none as a distributive share of the gain CMH should have reported if the cash and deferred payment right were taxable boot in the section 351 exchange.

Even so, we agree with petitioner that its attempt to disavow the form of its transaction raises no whipsaw potential. CMH did not report the transaction in a manner inconsistent with petitioner's claimed step-up in asset basis. Again, the partnership did not report the transaction at all. Therefore, respondent could have reason to pursue adjustment of the partnership's reporting regardless of whether petitioner reported the transaction in accordance with its alleged substance or instead followed the transactional form.

We also accept petitioner's avowal that, at the end of the day, the parties did not "have differing interests regarding whether CMI could claim a step-up in basis." As explained above, at the partnership level CMH might well have been allowed more recovery of basis if the tax consequences of the transaction had been determined in accordance with its form. But any reduced partnership gain would likely have been of no consequence to its partners. If the special allocation provision added to CMH's Operating Agreement in anticipation of the transactions

**[*69]** in issue complied with section 704(b)[21] and thus had its intended consequence, any income or gain from the partnership's receipt of the $2.7 million cash and the deferred payment right would have been allocated to Mr. Gerszberg. In that case, Mr. Gerszberg would have been the sole beneficiary of any additional basis recovery allowed if the transaction were taxed in accordance with its form. But he should have been indifferent to whether he recognized gain as a distributive share of the partnership's gain or instead from the redemption of his interest in the partnership. Any distributive share gain would have increased the basis of his partnership interest, see sec. 705(a)(1)(A), and thereby reduced the gain he recognized on the redemption of his interest. Conversely, structuring the transaction to allow the partnership greater recovery of basis would (again, assuming the added special allocation was effective) have reduced Mr. Gerszberg's distributive share gain but increased the gain he recognized on the redemption of his partnership interest. And we have no reason to think that the character of the gain would have differed; it should have been capital gain in either case.

Although CMH did not report the cash and deferred payment as boot in the section 351 exchange, paragraph 4.6(a) of the Unit Purchase Agreement, regarding

---

[21]Under sec. 704(b), provisions in a partnership agreement allocating among partners items of income, gain, loss, deduction, or credit are respected only if they "have substantial economic effect".

[*70] the Tax Distribution Amount to which Mr. Gerszberg was entitled, suggests that the parties contemplated that CMH would report the transaction in that manner. That provision entitled Mr. Gerszberg to not only the specified Closing Payment for his interest in CMH (i.e., $2.7 million in cash and the assignment of CMH's right to receive the $300,000 deferred payment from petitioner), but also the Tax Distribution Amount provided for in CMH's Operating Agreement (to allow him to pay tax on his distributive share of CMH's taxable income for 2009). But his entitlement to a Tax Distribution Amount was subject to the proviso that, in computing that amount, any taxable income attributable to CMH's receipt of boot in the section 351 exchange was to be disregarded. The proviso appears to rest on the premise that Mr. Gerszberg did not need an additional distribution to pay the tax on his receipt of $2.7 million cash and the deferred payment right. Assuming his combined marginal tax rate was less than 90%, he could easily have paid the tax due from his receipt of the specified Closing Payment out of the cash portion of that payment. But that premise would hold true regardless of whether CMH's receipt of the $2.7 million cash and the deferred payment right were treated as boot in the section 351 exchange or instead--following the form of the transaction--as a distribution in redemption of 1,875,000 of the 4,999,000 shares petitioner issued in exchange for the assets of the transferred business. Under the

[*71] plain terms of paragraph 4.6(a) of the Unit Purchase Agreement, if CMH had reported gain under section 301(c)(3) rather than section 351(b)(1), the limiting proviso would not have applied. Mr. Gerszberg would then have been entitled to $2.7 million in cash, the right to the $300,000 deferred payment, and an additional Tax Distribution Amount sufficient to pay the tax not only on his share of any taxable income from CMH's normal operations but also on all of the gain CMH recognized as a result of the redemption of 1,875,000 shares of its stock in petitioner. In effect, the entire Closing Payment of roughly $3 million would be "grossed up" to cover tax, leaving Mr. Gerszberg to pocket, after tax, the full value of the Closing Payment. We cannot imagine that the parties intended that result. Therefore, the scope of the proviso included in paragraph 4.6(a) of the Unit Purchase Agreement--applicable only to gain recognized from CMH's receipt of boot in the section 351 exchange and not to income or gain recognized by CMH as a result of the redemption of 1,875,000 of shares of petitioner's stock--indicates that the parties envisioned that CMH's receipt of the $2.7 million cash and $300,000 deferred payment right would be treated as taxable boot and not, under the form of the transaction, as a distribution in redemption of part of CMH's stock in petitioner.

[*72] To sum up, in considering whether to allow petitioner to disavow the form of its transactions and treat the cash and deferred payment right as boot in the section 351 exchange, we ask why the parties did not adopt that transactional form to begin with. And the parties had an obvious nontax reason for structuring the transactions as they did: Petitioner could not have paid CMH $2.7 million in cash in exchange for the assets it received from CMH because it did not have any cash until after the exchange. When petitioner acquired the assets of the transferred business, it simultaneously acquired all of the stock of OnNetworks and thus gained access to OnNetworks' remaining cash. Only then did petitioner have the wherewithal to pay CMH the cash Mr. Gerszberg apparently demanded for the redemption of his partnership interest.

Achievement of the parties' business objective did not require forgoing a corporate-level step-up in basis. Petitioner could have acquired the assets of the transferred business in exchange for 3,124,000 shares of its common stock and a $3 million note. The terms of the note could have called for repayment of $2.7 million before the close of business on November 25, 2009, and payment of the remaining balance of $300,000 on January 3, 2011. Immediately after the closing of the CM & JV Agreement, petitioner could have obtained $2.7 million in cash from OnNetworks (as it, in fact, did) and used the cash to make the initial payment

[*73] on the note. In that event, CMH would have recognized its realized gain to the extent of the value of the nonstock consideration (i.e., $2.7 million plus the present value of the $300,000 deferred payment), and petitioner would have been entitled to a corresponding step-up in the bases of the transferred assets.

The parties' failure to pursue a structure along those lines suggests that the prospect of a step-up in corporate asset basis was an afterthought--perhaps arising only when petitioner's accountants began preparing its 2010 return. To the extent the structuring of the transactions involved tax planning, that planning seems to have been focused on insulating CMH's continuing partners from any adverse tax consequences from the redemption of Mr. Gerszberg's interest. The circumstances give us no reason to think that the goals of the tax planning encompassed achievement of a tax benefit to any party that would be inconsistent with allowing petitioner a step-up in the bases of the assets it acquired from CMH. We therefore conclude that petitioner should be allowed to invoke the substance-over-form doctrine. Having determined that petitioner is not foreclosed from invoking that doctrine, we next consider whether its application justifies the recharacterization of the transaction that petitioner seeks.

**[*74]** III.     Application of Step Transaction Doctrine

The question of the consequences of applying the step transaction doctrine is more easily answered than that of petitioner's right to invoke the doctrine.  We have no doubt that, when applied, the doctrine requires us to disregard the issuance and immediate redemption of 1,875,000 shares of petitioner's common stock.  The issuance of stock subject to an obligation that it be immediately redeemed has no economic substance.  If CMH or any other party had sought a tax benefit from respecting the separate steps of the issuance and immediate redemption of those shares, we have no doubt that respondent would promptly invoke the step transaction doctrine to collapse those steps, and we would likely have upheld respondent's position.  Because petitioner has met the burden it must meet for applying the doctrine in its favor, the same result should obtain.  Much ink has been spilled on the question of how proximate various steps must be, in time or intention, for them to be combined under the step transaction doctrine. See, e.g., Andantech L.L.C. v. Commissioner, T.C. Memo. 2002-97, 2002 WL 531143, at *26-*29 (describing "three alternative tests" courts have applied "in deciding whether the step transaction doctrine should be invoked in a particular situation"), aff'd in part and remanded, 331 F.3d 972 (D.C. Cir. 2003).  But the present cases do not require us to limn the doctrine's ultimate bounds.  If the step

**[*75]** transaction doctrine has any potency, it necessarily applies to combine a first step that occurs when a preexisting obligation requires the immediate execution of a second step that undoes the first. In <u>Glacier State Elec. Supply Co. v. Commissioner</u>, 80 T.C. at 1057-1058, we rejected the taxpayer's step transaction argument because, as we explained: "[The taxpayer] is not asking us to skip, collapse, or rearrange the steps * * * [it] employed. * * * [It] is instead asking that we accept an entirely new series of steps or events that did not take place. The step transaction doctrine cannot be stretched so far."[22] In the present cases, by contrast, petitioner asks only that we collapse two offsetting steps. It is not asking that we invent new steps, or "synthesize" a transaction that did not, in fact, occur. Cf. <u>Estate of Durkin v. Commissioner</u>, 99 T.C. at 577. It is not even asking to rearrange steps actually taken. The step transaction doctrine has more than

---

[22]The transactions at issue in <u>Glacier State Elec. Supply</u> involved two corporations that were owned by three individuals: Parsons, Reardon, and Pyle. All three individuals owned stock of the taxpayer corporation. The taxpayer owned two-thirds of the stock of a subsidiary, GSB. One of its shareholders (Pyle) owned the remaining one-third of GSB directly. Upon Parsons' death, the taxpayer was obligated to redeem the stock held by his estate. To raise the necessary funds, the taxpayer caused GSB to redeem some of the stock the taxpayer held. The Commissioner claimed that the redemption of the taxpayer's GSB stock resulted in capital gain. The taxpayer argued that it should be treated as if it had distributed the redeemed GSB stock to Parsons' estate, with GSB then treated as having redeemed the stock from the estate. (Under that recast, the taxpayer's distribution of GSB stock would have been entitled to nonrecognition treatment under the law then in effect.)

**[\*76]** enough elasticity to disregard the issuance and immediate redemption of 1,875,000 shares of petitioner's common stock. Therefore, by application of that doctrine, we conclude that petitioner should be treated as having acquired the assets of the transferred business in exchange for 3,124,000 shares of its common stock, $2.7 million in cash, and an obligation to make an additional payment of $300,000 on January 3, 2011.

IV.   Petitioner's Bases in the Amortizable Section 197 Intangibles Acquired From CMH

A.   Introduction

In the transaction, as recharacterized, CMH was required to recognize any gain it realized from the exchange of the transferred business assets for common stock in petitioner, cash, and the deferred payment right. See sec. 351(b)(1). CMH's recognized gain, however, was limited to the $2.7 million cash it received at closing and the fair market value of its right to receive an additional $300,000 a little over a year later. See id. Any gain recognized to CMH increased petitioner's bases in the assets above the carryover bases with which the corporation would otherwise have received those assets. See sec. 362(a).

Respondent claims that "[s]ection 362(a) * * * requires that petitioner's basis in the property received is the same as that in the hands of the transferor"

[*77] because "neither CMI nor * * * [CMH] reported any gain in the transaction." CMH's failure to report the gain, however, did not affect petitioner's bases in the assets. By its plain terms, section 362(a) allows the transferee corporation in a section 351 exchange to increase its bases in transferred assets by "the amount of gain recognized to the transferor", without regard to whether the transferor reports that recognized gain.[23]

Because the character of any gain recognized in a section 351 exchange may differ depending on the nature of the transferred assets, a transferor who receives taxable boot in addition to stock of the transferee corporation must determine gain on an asset-by-asset basis. See Easson v. Commissioner, 33 T.C. 963, 975 (1960), rev'd, 294 F.2d 653 (9th Cir. 1961); see also Rev. Rul. 68-55, 1968-1 C.B. 140. The transferee corporation's basis in each asset equals the transferor's basis in the asset increased by the gain recognized by the transferor in the exchange of that asset for stock and boot. Easson v. Commissioner, 33 T.C. at 975. In determining the amount of recognized gain from the exchange of each asset, the Service held in

_____

[23]Conversely, when the transferor in a tax-free sec. 351 exchange erroneously reports gain, the transferee corporation is not entitled to increase its bases in the transferred assets beyond their bases in the hands of the transferor. See Truck Terminals, Inc. v. Commissioner, 33 T.C. 876, 888 (1960), aff'd in part, rev'd in part and remanded, 314 F.2d 449 (9th Cir. 1963); Gooding Amusement Co. v. Commissioner, 23 T.C. 408, 423-424 (1954), aff'd, 236 F.2d 159 (6th Cir. 1956).

[*78] Rev. Rul. 68-55, supra, that cash or other taxable boot should be allocated among the various assets in proportion to their relative fair market values. The transferor then must recognize gain in respect of each asset equal to the lesser of that asset's realized gain or the value of the boot allocable to the asset.

Petitioner seems to accept that, in computing the step-up in the bases of the assets of the transferred business, the value of the cash and the deferred payment right treated as boot under the step transaction recast should be allocated among those assets in proportion to their relative fair market values as prescribed by Rev. Rul. 68-55, supra. Respondent disputes application of that ruling not because he believes we should use a different method of allocating boot but instead because he insists that, given that "no party recognized any 'boot' or gain on the merger/reorganization transaction at issue[,] petitioner is not entitled to a step-up in basis under the provisions of section[] 351 or 362 of the Internal Revenue Code." In any event, we would look with disfavor on any effort by respondent to take a position contrary to one of his own revenue rulings. See, e.g., Rauenhorst v. Commissioner, 119 T.C. 157, 171 (2002) (rejecting the proposition "that the Commissioner is not bound to follow his revenue rulings in Tax Court proceedings").

[*79] In Easson, we employed an approach to the allocation of gain recognized in a section 351 exchange that differed from that later adopted by Rev. Rul. 68-55, supra. Easson involved a taxpayer's transfer to a corporation of land and a building subject to a mortgage the exceeded the property's basis. The transaction occurred in a year governed by the Internal Revenue Code of 1939 and thus was not subject to section 357(c) of the 1954 Code, which (like the corresponding provision in the 1986 Code) required a transferor shareholder in a section 351 exchange to recognize gain to the extent that liabilities encumbering the transferred property exceed that property's basis. We viewed Congress' enactment of section 357(c) as "clarify[ing] existing law rather than * * * amend[ing] it", Easson v. Commissioner, 33 T.C. at 971, and required the shareholder to recognize gain equal to the excess of the liabilities that encumbered the transferred property over its basis. Because gain attributable to the building would have been ordinary income while gain attributable to the land would have been capital gain, we had to apportion the shareholder's recognized gain between those two assets. We did so not on the basis of their proportionate values but instead in proportion to the shareholder's realized gain in each asset. Id. at 975. After our decision in Easson, the Department of the Treasury issued regulations under section 357(c) that require gain recognized under that section to be apportioned among transferred

[*80] assets in proportion to their relative values, as Rev. Rul. 68-55, supra, requires for the apportionment of gain attributable to taxable boot. See sec. 1.357-2(b), Income Tax Regs. Therefore, even leaving aside the reversal of our decision in Easson by the Court of Appeals for the Ninth Circuit, our Opinion in that case has little or no precedential value concerning the determination of gain attributable to specific transferred assets as a result of a shareholder's receipt of boot in a section 351 exchange.

Regardless of how we allocate boot among the transferred assets, petitioner is not entitled to the full $3 million step-up in the bases of amortizable section 197 intangibles that it claimed as a result of the exchange in which it acquired those assets. To begin with, the gain CMH was required to recognize under section 351(b) was necessarily less than $3 million: Given the time value of money, the partnership's right to receive $300,000 in a little over a year was not worth the full $300,000 future payment. See sec. 351(b)(1) (limiting amount of gain recognized to "(A) the amount of money received, plus (B) the fair market value of * * * other property received"). In addition, the allocation of part of the cash and the value of the deferred payment right to assets other than amortizable section 197 intangibles would reduce the gain recognized from CMH's transfer of amortizable section 197 intangibles and thus the resulting step-up in the bases of those assets.

**[\*81]** B.    Petitioner's Invocation of the Cohan Rule

Petitioner conceded (only after our request for supplemental briefs) that its accountants' "post-closing reporting of the step-up in the basis of the intangibles contributed to CMI in the CMJVA for the 'boot' left much to be desired". Petitioner now acknowledges that the accountants "did not allocate the * * * step up among the CMH contributed assets as required by Rev. Rul. 68-55 nor did * * * [they] take into consideration the potential decrease in the value of the $300,000 note" to reflect the time value of money.  Petitioner also admits that "an appraisal of the transferred assets was not obtained at the time of the transaction", hindering our ability to allocate boot among the assets of the transferred business on the basis of their relative fair market values.  Nonetheless, petitioner urges us to apply the "principle" established in Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930), and "make an estimate of the proper amortizable step-up in basis for the contributed assets resulting from the 'boot' payment".

The Cohan rule "allows us to estimate the amounts of allowable deductions when there is evidence that the taxpayer incurred deductible expenditures." Ashkouri v. Commissioner, T.C. Memo. 2019-95, at \*31.  "To do so, however, we must have some basis on which to make an estimate."  Id. (citing Vanicek v. Commissioner, 85 T.C. 731, 742-743 (1985)).

**[\*82]** Although <u>Cohan</u> itself involved a Broadway producer's claimed deductions for travel and entertainment expenses, we have applied the principle of that case in other contexts. In particular, we have relied on <u>Cohan</u> to estimate a taxpayer's basis in property. <u>See, e.g.</u>, <u>Huzella v. Commissioner</u>, T.C. Memo. 2017-210, at \*7-\*9.

In directing our predecessor, the Board of Tax Appeals, to estimate the deductible expenses incurred by the taxpayer in <u>Cohan v. Commissioner</u>, 39 F.2d at 544, the Court of Appeals for the Second Circuit allowed the Board to "bear[] heavily \* \* \* upon the taxpayer whose inexactitude is of his own making." Petitioner, however, disclaims responsibility for the inadequacy of the record in the present cases. On the premise that it "was in no way at fault for the absence of a complete record", petitioner contends that the estimated allocation of basis it seeks "should not in any way be reduced or limited". Petitioner claims that, before we raised the question of the value of the deferred payment right and the allocation of any step-up in basis between amortizable and nonamortizable assets in a conference call held after the parties had submitted two rounds of briefs, "Respondent never disputed or raised any question regarding the numerical reporting by \* \* \* [petitioner's accountants] either at the audit level or thereafter". In petitioner's characterization, "[t]he only position advanced by the Respondent

[*83] was that there was no 'boot' received by party [sic] to the IRC § 351 transaction because the CMJVA and the Stock Repurchase Agreement between CMI and CMH * * * were separate transactions."  Petitioner's understanding of respondent's position influenced its decisions regarding the evidence it sought to present.  As petitioner explains:

> Because no question had been raised about whether the assets received were qualified intangibles or how any step up in basis should be allocated among the assets contributed by CMH, the Petitioner's trial presentation (and the Stipulation of Facts prepared in anticipation of the trial) did not address these questions and only focused on showing that the buyout of Gerszberg was an integral and essential step in closing the CMJVA and thus establishing that the $3,000,000 paid by CMI to enable CMH to redeem Gerszberg's interest was "boot" because it was paid by CMI to CMH as part of the consideration for CMH's contributed assets.

Petitioner contends that "the correct amortizable step up is $2,913,652.34 rather than the $3,000,000 * * * [its accountants] reported."  Petitioner determined the present value of the deferred payment right by applying the applicable Federal rate (AFR) in effect for November 2009 of 0.71%, see Rev. Rul. 2009-35, 2009-44 I.R.B. 568, 569, to arrive at a present value of $297,656.  Petitioner reasons that, because "the note was due, * * * only 13 months after the closing," and on the premise that it was "actually paid" (as Mr. Gerszberg's tax reporting indicates), "the note should not be subject to any valuation discount for the creditworthiness

[*84] of the debtor". Petitioner thus values the taxable boot that CMH received in the section 351 exchange at $2,997,656 ($2,700,000 + $297,656). On the premise that the shares it issued in exchange for the transferred assets and did not immediately redeem had a value of $5 million, petitioner assigns a total value to the assets of $7,997,656 ($5,000,000 + $2,997,656).[24] Next, petitioner assigns values to those assets that it acquired from CMH that it accepts were not amortizable section 197 intangibles--prepaid expenses and fixed assets. In each case, petitioner values those assets at their book values of $224,119 and $803, respectively. Petitioner thus concludes that the amortizable section 197 intangibles it received from CMH were worth $7,772,734 ($7,997,656 total value less the $224,119 value assigned to prepaid expenses and the $803 value assigned to fixed assets). Consequently, petitioner allocates $2,913,351 of the boot to

---

[24]Petitioner's analysis seems to rest on the premise that CMH was entitled to receive 5 million of its common shares in exchange for the assets of the transferred business. If that were correct, and those assets had an aggregate value of $8 million, each common share would have been worth $1.60 ($8,000,000 ÷ 5,000,000), and the 3,125,000 shares that CMH retained after the redemption would have been worth $5 million (3,125,000 × $1.60). But CMH received only 4,999,000 of petitioner's common shares in exchange for the transferred assets. In pricing the transactions in issue, the parties seem to have disregarded the 1,000 shares of petitioner's common stock outstanding before execution of the CM & JV Agreement, as well as the prospect that the $300,000 deferred payment included imputed interest. Consequently, the per-share prices implied by the asset transfer and the redemption that immediately followed were different--the first being slightly above $1.60 and the second slightly below that amount.

[*85] amortizable section 197 intangibles ($2,997,656 × ($7,772,734 ÷ $7,997,656)). (We are unable to identify the approximately $300 discrepancy between the $2,913,652 amortizable step-up that petitioner claims and the $2,913,351 figure resulting from its detailed calculations.)

C.    Respondent's Response

Respondent observes that, for us to apply Cohan, "[t]here must be sufficient evidence in the record to provide a basis for making an estimate." In particular, "[t]here must be some indicia of reliable information that the Court can extrapolate from in order to estimate the appropriate basis." "[H]ere", respondent asserts, "there is none." According to respondent, "the record is devoid of any credible evidence to substantiate the appropriate fair market value or date of transfer basis of any of the claimed amortizable assets." Respondent concludes: "Petitioner failed to establish a reliable basis for the Court to make an estimated determination."

**[\*86]** D.     <u>Analysis</u>

      1.      <u>Allowance of Estimate Under Cohan</u>

As a result of its acquisition of the assets of the transferred business, recharacterized by application of the step transaction doctrine, petitioner is undeniably entitled to a substantial increase in the bases of those assets. In the recharacterized transaction, CMH received taxable boot with a value approaching $3 million. Because the assets were worth $8 million and had an aggregate basis of approximately $265,000,[25] CMH's realized gain far exceeded the value of the boot it received. Although the precise amount of CMH's recognized gain, and petitioner's corresponding step-up, depends on the value assigned to the deferred payment right, it is clear that the gain and step-up approach $3 million.

---

[25]A proposed finding included in respondent's opening brief indicates that he would accept the figures for the value and aggregate basis of the transferred assets that petitioner and CMH reported in their 2009 tax returns. Petitioner did not object to respondent's proposed finding in its reply brief. In its supplemental brief, however, petitioner observed that the reported basis figure did not include the $25,836 basis of the domain name. Because the $4,808 of amortization that respondent would allow includes amortization claimed in respect of the domain name, he apparently does not dispute that the domain name was included among the assets of the transferred business. Adding the basis of the domain name to the basis reported in petitioner's and CMH's disclosures under sec. 351 and adjusting for the $109 apparent difference between the book value and tax basis of the fixed assets and trademarks would result in an aggregate basis of $263,647 ($237,702 + $25,836 + $109).

[*87] The record before us and concessions respondent has made establish that the assets of the transferred business included amortizable section 197 intangibles. Given the nature of the transferred business, it is possible--even likely--that a considerable portion of CMH's recognized gain and petitioner's corresponding step-up in bases are attributable to amortizable section 197 intangibles. Under the circumstances, it would be unduly harsh to limit petitioner's amortization deductions to those attributable to the $38,725 of carryover basis it inherited from CMH and deny it any additional amortization deductions in respect of the increase in basis section 362(a) allows.

Determining the portion of the step-up in basis resulting from petitioner's acquisition of the transferred business that is allocable to amortizable section 197 intangibles requires us to determine the relative values of those assets and the business' other assets. Petitioner acknowledges that "[a] formal valuation of the transferred assets was not done as part of the CMJVA closing nor was [a] detailed itemization of the self-created intangibles required as part of the CMJVA transaction". As petitioner explains, that was "because the valuation placed on CMH's contributed assets was based on the actual and projected revenue numbers." For the reasons explained below, we agree with petitioner that, even without a formal valuation, the record allows us to estimate the relative values of

[*88] those assets of the transferred business that did and did not qualify as amortizable section 197 intangibles. We also find unnecessary a detailed itemization of section 197 intangibles in respect of which CMH had not been claiming amortization because of the exclusion for self-created intangibles provided in section 197(c)(2). But we disagree with petitioner that the circumstances do not warrant our bearing against it in estimating the relative values of the transferred assets.

2.    Appropriateness of Residual Method of Allocation

Petitioner's basic approach of assigning to section 197 intangibles any portion of the total asset value not attributable to identifiable other assets is consistent with the "residual method" of valuation that section 1060 mandates in allocating the purchase price paid in a taxable purchase and sale of a business. See sec. 1.1060-1(a)(1), Income Tax Regs. Under that approach, the assets in each of seven classes are assigned, in succession, a portion of the purchase price equal to their fair market value. See id.; sec. 1.338-6(b), Income Tax Regs. Any value not attributable to assets in the first five classes is assigned to section 197 intangibles. Sec. 1.338-6(b), Income Tax Regs. (providing that Class VII consists of goodwill and going-concern value; all other section 197 intangibles make up Class VI).

**[\*89]** By its terms, section 1060 applies to "applicable asset acquisitions[s]."

Section 1060(c) defines "applicable asset acquisition" to mean "any transfer * * *

(1) of assets which constitute a trade or business, and (2) with respect to which the

transferee's basis in such assets is determined wholly by reference to the

consideration paid for such assets." Despite that statutory definition, section

1.1060-1(b)(8), Income Tax Regs., provides: "A transfer may constitute an

applicable asset acquisition notwithstanding the fact that no gain or loss is

recognized with respect to a portion of the group of assets transferred."

Regardless of whether the residual method of allocation directly applies to

the transaction in which petitioner acquired the assets of the transferred business,

we find the principles underlying that method useful at least by analogy. The rules

serve to prevent the purchaser of a business from assigning to assets eligible for

shorter cost recovery periods values that are economically attributable to goodwill

or going-concern value.[26] See S. Rept. No. 99-313, at 253-254 (1986), 1986-3

C.B. (Vol. 3) 253-254. Although petitioner did not attempt to allocate any portion

---

[26]When Congress mandated the use of the residual method in purchase price allocations with its enactment of sec. 1060 in 1986, it had not yet enacted sec. 197. Therefore, goodwill, going-concern value, and similar intangible assets were not then amortizable. It remains the case, however, that the recovery periods allowed for the costs of many tangible assets used in a business are shorter than the 15-year amortization period allowed for sec. 197 intangibles. See sec. 168(c).

[*90] of its claimed step-up in asset basis to the fixed assets it acquired from CMH, other taxpayers who acquire the assets of a business in a section 351 exchange with boot might attempt to overstate the portion of the step-up in basis allowed to assets with recovery periods shorter than 15 years. Therefore, when the assets transferred in a partially taxable section 351 exchange constitute a trade or business, the allocation of the basis step-up allowed by section 362(a) implicates the concerns that led Congress to mandate the residual method of allocation in section 1060.[27] Consequently, in allocating the boot petitioner paid in the section 351 exchange among the assets it received in that exchange, we will assign to goodwill and other section 197 intangibles any excess of the $8 million agreed total value of the transferred assets over the estimated value of specifically identifiable assets that do not qualify as section 197 intangibles.[28]

---

[27]The principles of the residual method do not conflict with the holding of Rev. Rul. 68-55, 1968-1 C.B. 140. That ruling concludes that gain recognized in a sec. 351 exchange with boot must be computed on an asset-by-asset basis and that, in making that calculation, "the fair market value of each category of consideration received must be separately allocated to the transferred assets in proportion to the[ir] relative fair market values". Id., 1968-1 C.B. at 141. The ruling does not prescribe the specific mechanics to be employed in determining the relative fair market values of the transferred assets. When those assets constitute an entire trade or business, the residual method can appropriately be applied in making that determination.

[28]The circumstances of the present cases do not require us to distinguish

(continued...)

**[*91]**        3.        <u>Responsibility for Inadequacy of Record</u>

In determining the value of assets that do not qualify as section 197 intangibles, we will, as the Court of Appeals suggested in <u>Cohan v. Commissioner</u>, 39 F.2d at 544, "bear[] heavily" against petitioner. Contrary to petitioner's claims, we judge the inadequacy of the record to be "of * * * [its] own making." <u>Id.</u>

We can understand why petitioner might have had difficulty discerning respondent's position. While respondent's notice of deficiency for 2010 through 2012 included only a broad description of the grounds for his disallowance of the amortization deductions petitioner claimed, the explanation included with the 2013 notice focuses on petitioner's claimed step-up in the bases of the amortizable section 197 intangibles attributable to its payment of cash and the deferred

---

[28](...continued)
between goodwill and going-concern value and other section 197 intangibles. That distinction can be relevant when the character of the seller's gain is at issue. Any gain attributable to goodwill and going-concern value would be capital gain. <u>See</u> sec. 1221(a). By contrast, value attributable to a covenant not to compete would be ordinary income. <u>See</u> <u>Ullman v. Commissioner</u>, 264 F.2d 305, 307 (2d Cir. 1959) ("It is well established that an amount a purchaser pays to a seller for a covenant not to compete in connection with a sale of a business is ordinary income to the covenantor[.]"), <u>aff'g</u> 29 T.C. 129 (1957). From a purchaser's perspective, however, any basis attributable to goodwill and going-concern value would be treated in the same manner as basis attributable to other amortizable section 197 intangibles. Sec. 197 allows the purchaser to amortize the basis of each of those assets over 15 years. Therefore, for purposes of the cases before us, in which the character of CMH's gain is not in issue, we can treat all section 197 intangibles as a single residual class.

[*92] payment right. But the deficiency respondent determined for 2013, like those he determined for the earlier years, reflected his disallowance of all of the amortization petitioner claimed in respect of intangible assets it acquired from CMH--not just that portion of the amortization attributable to the claimed step-up in basis. Similarly, while respondent directed the arguments made in his pretrial memorandum at the claimed step-up in basis, he continued to identify the full amounts of the deficiencies stated in the notices as the amounts in dispute.

Petitioner claims that its perception of respondent's position influenced its trial preparation--including, in particular, its approach to "the Stipulation of Facts prepared in anticipation of the trial". But the parties executed their stipulations of fact only on the day of trial. Until then, respondent had consistently maintained that petitioner was not entitled to any of the $204,808 of amortization deductions claimed in respect of intangible assets it acquired from CMH.

Despite the lack of clarity in respondent's position--indeed, because of it-- petitioner should have been prepared to present evidence at trial to establish all facts necessary to justify the full $204,808 of amortization deductions it claimed in respect of intangible assets it acquired from CMH. If petitioner had wanted to reduce the evidentiary burden it faced at trial, it could have sought a stipulation, well before trial, to narrow the issues in dispute. For example, it could have

[*93] sought respondent's concession that the intangible assets it acquired from CMH were amortizable section 197 intangibles and that, if the cash and deferred payment right it paid to CMH in redemption of 1,875,000 shares of its common stock were treated as boot in the section 351 exchange, it was entitled to the full $204,808 of amortization deductions it claimed in respect of those assets. Again, however, respondent made no concession until the day of trial. And even that concession relates only to the carryover portion of petitioner's claimed bases in amortizable section 197 intangibles. It does not accept the amount of any increase in basis should one be allowed.

Because we conclude that petitioner bears responsibility for any inadequacies in the record concerning the relative values of the assets it acquired from CMH, we will endeavor to "bear[] heavily" against petitioner in estimating those relative values. See Cohan v. Commissioner, 39 F.2d at 544. As will become apparent, the circumstances do not provide us much room to bear against petitioner. But to the extent that we can, we will do so. While we accept petitioner's basic methodology as consistent with, and supported by, the residual method of basis allocation prescribed by section 1060, we will not accept petitioner's specific estimates.

**[*94]** 4. Valuation of Deferred Payment Right

To start with, we reject the AFR as an appropriate rate at which to discount the deferred payment right to determine its present value on November 25, 2009. The Secretary determines the AFRs in effect, from time to time, on the basis of the yields on marketable securities issued by the United States. Sec. 1274(d)(1)(C). The appropriate interest rate for obligations of debtors whose credit risk exceeds that of the Federal Government should be higher. We do not accept petitioner's suggestion that the relatively short term of the deferred payment right and its actual payment would obviate, at least with the benefit of hindsight, the need to discount the value of that right on account of the payor's creditworthiness. A debtor's ultimate satisfaction of a debt does not establish that the creditor assumed no credit risk ex ante. The risk assumed by the creditor may be less the shorter the term of the debt. But petitioner provides no evidence that the interest rates on obligations of 13 months or less issued by borrowers other than the Federal Government do not exceed the AFR. Moreover, potential creditors of petitioner had justifiable grounds to view an investment to fund continued development of a relatively new business as involving significantly more risk than an investment in Treasury securities with comparable terms.

**[\*95]** We believe it more appropriate, under the circumstances, to value the deferred payment right by discounting it at the underpayment rate established under section 6621(a)(2)--that is, the Federal short-term rate plus 3 percentage points. Congress adopted that rate to avoid giving taxpayers an incentive "to delay paying taxes as long as possible". S. Rept. No. 99-313, at 184 (1986), 1986-3 C.B. (Vol. 3) 184. The underpayment rate is thus intended to be no less than the rate at which taxpayers could borrow money from other sources. As petitioner observes, the Federal short-term rate in effect for November 2009 was 0.71%. See Rev. Rul. 2009-35, 2009-44 I.R.B. at 569. Adding 3 percentage points to that rate produces a rate of 3.71%. The present value of $300,000, discounted 13 months at a monthly rate of 0.3092 (3.71% ÷ 12), is $288,198. Assigning that value to the deferred payment right results in a total value of the taxable boot paid by petitioner to CMH of $2,988,198 ($2,700,000 + $288,198). We now turn to the task of determining the proportion of that amount allocable to the amortizable section 197 intangibles that petitioner acquired from CMH.

**[*96]**      5.      <u>Prepaid Expenses, Furniture and Fixtures, and Software</u>

We see no basis in the record for valuing the prepaid expenses that petitioner acquired from CMH at other than their book value of $224,119, but we disagree with petitioner that it was "logical[]" to "assume[] * * * that the book value of CMH's contributed furniture and fixtures * * * was, at best, its fair market value on the date of contribution".  That assumption would treat as worthless most of the fixed assets that petitioner claims to have received from CMH.

In a proposed finding in its supplemental brief, petitioner asserts that the fixed assets and computer software shown on the depreciation and amortization report included with CMH's 2009 return that also appear on the comparable report included with its own return for 2010 "were disposed of on November 25, 2009 by contribution to CMI as part of the CMJVA transaction."  In his own supplemental brief, respondent objects to petitioner's proposed finding with the observation that CMH's depreciation and amortization schedule "does not show that the listed property was disposed of on November 25, 2009."  Respondent is, of course, correct.  And the comparable schedule included with petitioner's 2010 return is also not evidence that it acquired those assets.  Cf. <u>Wilkinson v. Commissioner</u>, 71 T.C. 633, 639 (1979) ("The fact that a return is signed under penalty of perjury is not sufficient to substantiate deductions claimed on it.").  But treating the 17

**[*97]** commonly reported items as having been included in CMH's transfer to petitioner will have the effect of reducing the portion of the boot allocable to the amortizable section 197 intangibles that CMH transferred.  Therefore, we accept petitioner's factual claim not because the evidence supports it but instead because doing so will, under the circumstances, bear against petitioner.

We find it implausible that most of the items of furniture and fixtures, machinery and equipment, and computer equipment that petitioner professes to have received from CMH had no value whatsoever.  If those assets were worth the bother of transferring, and petitioner continued to use them in the conduct of the transferred business, they must have had some value.  Bearing against petitioner, we will assume that those assets were worth their original cost of $132,993.

As we understand petitioner, its position in regard to the items of computer software included among the 17 items referred to above is not that the software was worthless when CMH transferred it to petitioner but instead that the items of software qualified as amortizable section 197 intangibles.  Therefore, whatever value that software had was, in petitioner's view, appropriately included in the residual value it assigned to amortizable intangibles.

Section 197(e)(3)(A) excludes from the definition of "section 197 intangible" "[a]ny--(i) computer software which is readily available for purchase

[*98] by the general public, is subject to a nonexclusive license, and has not been substantially modified, and (ii) other computer software which is not acquired in a transaction (or series of related transactions) involving the acquisition of assets constituting a trade or business or substantial portion thereof." The cost of software that is not covered by section 197 can be amortized over three years if the software has an ascertainable useful life. Sec. 167(f)(1)(A); secs. 1.167(a)-3, 1.167(a)-14(b)(1), Income Tax Regs.

Petitioner would apparently explain CMH's amortization over three years of the cost of the commonly reported software on the ground that the partnership did not acquire the software as part of its acquisition of a trade or business. Because petitioner did acquire the items of software as part of its acquisition of the transferred business, those items would be covered by section 197 if they were custom-developed for CMH and had not been available "off the shelf". Petitioner suggests that "the original cost of $26,036 for those three items acquired more than seven years before the instant transaction makes it unlikely that they are the type of off-the-shelf software which would be excluded from being an amortizable section 197 intangible." It is not obvious, however, how the software's age has any bearing on whether it was custom developed or whether, instead, CMH purchased it off the shelf. It might be that, the higher the cost of software, the

[*99] more likely that software would be to have been custom developed.

Therefore, petitioner may be suggesting that off-the-shelf software is unlikely to

cost $26,036. But that amount is the aggregate cost of three items whose separate

costs ranged from $7,784 to $9,690. We are unwilling to infer from the costs of

those items alone that they were custom developed and thus not excluded by

section 197(e)(3)(A) from the definition of section 197 intangibles. Therefore,

bearing against petitioner, we will treat the items of software as covered by the

section 197(e)(3)(A) exclusion so that any step-up in the bases of those assets is

not eligible for amortization under section 197(a). That CMH had apparently

amortized in full its cost of the software does not establish that it had no value.

As with the furniture and fixtures, machinery and equipment, and computer

equipment, we will assume that the three items of computer software that

petitioner professes to have acquired from CMH had a value, on November 25,

2009, equal to their original cost of $26,036.

      6.    <u>Additional Amortization Attributable to Increased Bases in
Amortizable Section 197 Intangibles</u>

Relying on the principles of the residual method, we will assign to section

197 intangibles the excess of the $8 million agreed value of the assets of the

transferred business over the value we have assigned to prepaid expenses,

[*100] furniture and fixtures, machinery and equipment, and computer equipment and software. Moreover, for the reasons explained below, we will treat all of the section 197 intangibles as amortizable section 197 intangibles.

Under section 197(c), a section 197 intangible qualifies as an amortizable section 197 intangible if the taxpayer acquired it after Congress' enactment of section 197, holds the asset in connection with a trade or business or other income-producing activity, and (in the case of assets other than governmental permits, covenants not to compete, franchises, trademarks, or trade names) did not create the asset. Petitioner acquired the assets of the transferred business in November 2009--well after the 1993 enactment of section 197. It follows from respondent's allowance of petitioner's amortization of its carryover bases in section 197 intangibles that petitioner used those assets during the years in issue in a trade or business or other income-producing activity. Finally, even if CMH created some of the section 197 intangibles it transferred to petitioner, those assets were not self-created intangibles in petitioner's hands.

We find no evidence in the record that any of the intangible assets that petitioner acquired from CMH were ineligible for amortization under section 197. Our request for supplemental briefs gave respondent the opportunity to identify any such assets, and he declined to avail himself of that opportunity. Rather than

**[*101]** provide us with his own estimate of the portion of any allowed step-up in basis allocable to amortizable section 197 intangibles, respondent simply maintained his puzzling insistence that CMH did not transfer any intangible assets to petitioner and his contention--contrary to the premise of our questions--that petitioner is not entitled to any step-up in basis because the cash and deferred payment right could not be treated as taxable boot in the section 351 exchange.

Treating amortizable section 197 intangibles as a single "catchall" asset category under the principles of the residual method, we value those assets at $7,616,852 ($8,000,000 agreed total asset value less the $224,119 value assigned to prepaid expenses, the $132,993 value assigned to fixed assets, and the $26,036 value assigned to computer software). Because the amortizable section 197 intangibles were worth 95.21% of the total asset value ($7,616,852 ÷ $8,000,000), we will assign to those assets the same percentage of the boot CMH received in the recharacterized section 351 exchange. Therefore, we treat $2,845,063 of the boot as allocable to amortizable section 197 intangibles ($2,988,198 total value of boot × .9521).

Under the approach adopted in Rev. Rul. 68-55, <u>supra</u>, CMH is treated as transferring each asset of the transferred business for the same mix of consideration, 37.4% boot ($2,988,198 ÷ $8,000,000) and 62.6% stock (1 − .374).

[*102] CMH's recognized gain in each asset was the lesser of realized gain or allocable boot. Thus, the boot allocable to an asset would not be treated as a return of capital unless its basis exceeded 62.6% of its value. We will leave aside the possibility of basis recovery, even though doing so favors petitioner. We view as quite unlikely the prospect that CMH's basis in any section 197 intangible included among the transferred business assets exceeded 62.6% of the asset's value. Moreover, the carryover basis in section 197 intangibles is small enough that, even if we were to assume maximum basis recovery, it would have an immaterial effect on the amount of amortization allowed to petitioner. Therefore, we will treat CMH as having recognized gain in amortizable section 197 intangibles equal to the full $2,845,063 of boot allocable to those assets and allow petitioner a corresponding increase to the bases of those assets. We thus conclude that petitioner is allowed amortization deductions for each of the years in issue in respect of amortizable section 197 intangibles acquired from CMH of $194,479 ($4,808 + ($2,845,063 ÷ 15)).

       7.    <u>No Additional Depreciation or Amortization of Increased Bases in Fixed Assets and Software</u>

Finally, we will not allow petitioner any additional depreciation or amortization deductions in respect of the increases in bases resulting from our

**[*103]** allocation of part of the taxable boot to fixed assets or computer software. Petitioner did not assign error to respondent's failure to allow additional deductions, beyond those claimed on its returns, for depreciation expenses or amortization of the costs of software not qualifying as section 197 intangibles. Moreover, even though section 6214 gives us jurisdiction to "redetermine the correct amount of * * * [a taxpayer's] deficiency", the record does not establish either that the software in question had an ascertainable useful life or the recovery periods applicable to the furniture and fixtures, machinery and equipment, and computer equipment included among the assets of the transferred business.

Decisions will be entered under

Rule 155.